Jones Appeal.

544

Argued September 28, 1972. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

*Ewing B. Pollock,* with him *Pollock, Pollock & Thomas,* for appellant.

*R. Wallace Maxwell,* with him *Maxwell and Davis,* for appellee.

*James Hook,* and *Hook & Hook,* for amicus curiae.

OPINION BY MR. CHIEF JUSTICE JONES, November 30, 1972:

Sarah Jones, the mother of the children named in this proceeding, was arrested for aiding and abetting the rape of her fourteen-year-old daughter, Ada Jones, accomplished by Mrs. Jones's paramour, Richard Shaw. An order of dependency and neglect was thereafter made as to appellant's nine children.[1] Placement in foster homes was accomplished under the auspices of the Child Welfare Service of Greene County.

Following her arrest, Mrs. Jones was committed to Mayview State Hospital for psychiatric evaluation. She was found to be neurotic and unstable, but not psychotic. She pled guilty to the charges against her

---

[1] Ada Jones and Barbara Jones have remained in the custody of Mrs. June Haring, appellant's sister, since the sexual violation of Ada Jones on March 29, 1971. The custody of these two children is not here questioned. Harry Jones, Lloyd Jones and Robert Jones were placed in the home of a maternal uncle and his wife, Mr. and Mrs. Harry Sellers, residents of Ohio, pursuant to a February 1, 1972, order of the court below. Richard Jones, Mary Jones, Lorena Jones and Laura Jones have been placed in foster care. Richard and Mary were born August 5, 1969. Lorena and Laura were born January 29, 1971. These two sets of twins are the only children to be placed for adoption. Though seven children are named, the parental right of Sarah Jones respecting the two sets of twins is the real subject of this appeal.

and, on August 23, 1971, Mrs. Jones was sentenced to an indeterminate term at Muncy State Prison not to exceed six years.

Appellant, after consultation with the Child Welfare Service, instituted proceedings for the *voluntary* termination of parental rights with respect to her seven younger children. When brought from Muncy on September 30, 1971, for a hearing pursuant to the termination of her parental rights, she recanted her voluntary termination position. She was permitted to withdraw her consent and, on the motion of the Child Welfare Service, the hearing was continued until such time as the court could consider the Service's request for voluntary termination of parental rights.

After a hearing on November 5, 1971, before the Honorable Glenn TOOTHMAN, President Judge of Greene County, an order of involuntary termination was entered pursuant to the Adoption Act of 1970, Act of July 24, 1970, P. L. 620, 1 P.S. §311(2), which reads in pertinent part as follows:

"The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:

. . .

"(2) The *repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care,* control, or subsistence necessary for his physical or mental well-being *and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. . . ."* (Emphasis added.)

Appellant questions whether her conviction for this single criminal act is demonstrative of a *continuing* incapacity justifying the termination of her parental rights under the 1970 Adoption Act. She also queries whether the court below improperly admitted into evi-

dence two written reports, each bearing upon appellant's alleged parental incapacity, but each alleging "facts" gathered and interpreted by persons not before the court below and thus not subjected to cross-examination in that proceeding.

Prior to the Adoption Act of 1970, the only basis for terminating parental rights was *abandonment*. *Sarver Adoption Case,* 444 Pa. 507, 281 A. 2d 890 (1971) ; *Vaders Adoption Case,* 444 Pa. 428, 282 A. 2d 359 (1971) ; *Com. ex rel. Harry v. Eastridge,* 374 Pa. 172, 97 A. 2d 350 (1953). Abandonment was defined as parental conduct exhibiting a settled purpose of relinquishing parental claim to the child *and* a refusal to perform parental duties. Act of April 4, 1925, P. L. 127, *as amended,* 1 P.S. §1.[2]

While the new Adoption Act must be viewed as an expansion of the courts' powers to terminate parental rights under the proper circumstances, the statutory standard of evidence necessary to support termination is nonetheless demanding. The legislative enactments demonstrate that the courts should not disturb the parent-child relationship in the absence of compelling evidence of *"repeated and continued incapacity, abuse, neglect or refusal"* to provide essential parental care.

The evidence proffered in support of termination includes appellant's guilty plea to the charge of accessory to rape of one of her own daughters. Though the single act is egregiously offensive, it does not, in itself, meet the statutory standard of *continued abuse* necessary to support involuntary termination.

The Child Welfare Service urges that Mrs. Jones's answer to the following inquiry by the court lends evidentiary support to the court's order of involuntary termination: "Q. Sarah, do you think the way these

---

[2] This Act was repealed by the Act of July 24, 1970, P. L. 620, 1 P.S. §601, effective January 1, 1971.

children were being reared in the last two years before [the rape] which you now stand committed and convicted and sentenced for was a proper environment for these children? A. No, I don't think it was."

Standing alone, and out of context, this colloquy between appellant and the court might support a reasonable inference that the appellant's parental incapacity was continuous and irremedial by her own admission. However, the colloquy continues: "Q. You are saying then that you could, after you are released from Muncy, and would be able to do better? A. Yes, sir. Me and my husband are going back together because he wants all of us to be a family and the children want their mother and father both." Her response is not indicative of a parent whose child neglect and abuse "cannot or will not be remedied."

The balance of the evidence proffered by the Welfare Service is rooted in two written documents,[3] both admitted into the record over objections by counsel for Sarah Jones.

---

[3] The record also discloses testimony by Miss Edwina Rex and Mr. Kenneth Jones, two Welfare Service case workers assigned to the case at the time of the indictment and incarceration of Mrs. Jones. By the admission of each, their knowledge of the quality of home provided by Sarah Jones is necessarily secondhand since neither was personally involved in this matter until after the children were taken from the mother. They are patently incompetent to testify as to the continuous and irremedial nature of Sarah Jones's parental incapacity.

Mrs. Evelyn Boord, probation officer of the court below, also testfied. On the basis of one visit to the home of Sarah Jones and the observation that Mrs. Jones kept a "clean home", but that she was "highly nervous", Mrs. Boord concluded that appellant was an unfit parent. While we are loathe to disturb the conclusions of the court below, it is hard to imagine that this testimony could form the basis of a finding of continuous, irremedial parental incapacity.

We thus look to the admissibility of the written reports considered since they alone could provide the evidentiary basis for the involuntary termination of Sarah Jones's parental rights.

One of these written documents is a summary of the Child Welfare Service's history of Sarah Jones and her children prepared November 4, 1971, the day before the subject proceeding, by Miss Edwina Rex and Mr. Kenneth L. Jones, Service case workers. The summary is a recounting of "facts" accumulated by the Service, specifically accumulated by persons other than Miss Rex and Mr. Jones. The facts alleged in the summary and not proven by collateral evidence, are therefore hearsay. *See,* 5 Wigmore, Evidence §1362 (3d ed. 1940). The report escaped the test of cross-examination with respect to the "facts" which underpin its conclusions, a test designed to probe sources of error and untrustworthiness lying beneath the untested assertions of the absent witnesses.

The Service report was admitted under the following circumstances: "THE COURT: Miss Rex, you have made this paper in conjunction with Mr. Jones's record and a report of the background of the case? MISS REX: Yes, sir.

. . .

"THE COURT: It will be marked as Exhibit A upon her identification and made a part of the record in this case. Is there any objection from counsel? [Mr. Pollock, counsel for Mrs. Jones, entered his objection.] THE COURT: The objection has merit, particularly with respect to heresay [sic] testimony contained in the report. . . . However, subject to its objection, the Court does admit the record, understanding that certain parts of that record are clearly objectionable and not to be considered."

While normally we will concede broad discretion to the court, sitting as trier of fact, to sift through evidence which is unreliable in part to consider that which is trustworthy, we believe that this summary is so permeated with hearsay that it could not justify the findings of fact of the court below.

Neither can we condone its admissibility by reason of the statutory hearsay exception of the Uniform Business Records as Evidence Act. Act of May 4, 1939, P. L. 42, §§1-4, 28 P.S. §§91a-d.[4] We cannot invoke the "business records" exception, though it may be factually applicable, because the record is void of the necessary accompanying evidence respecting the reliaability of the source of information from which the "facts" are drawn. Without evidence of the sources of information and the time and manner of preparation, the "business records" exception does not apply. *Githens, Rexsamer & Co. v. Wildstein*, 428 Pa. 201, 236 A. 2d 792 (1968); *Commonwealth v. Perdok*, 411 Pa. 301, 192 A. 2d 221 (1963); *Chester County Tax Claim Bureau Appeal*, 208 Pa. Superior Ct. 384, 222 A. 2d 602 (1966).

The second document admitted in evidence over hearsay objection by counsel for Sarah Jones is the written statement of Dr. Edward J. Patterson:

"11/4/71

"At the time I examined Mrs. Jones I felt that she was definitely psychotic and incapable of appropriate reasoning. Also, I indicated that I felt this problem was not situational, but rather of long duration, or having prior occurrence. I further fet [sic] that the prognosis was poor unless immediate treatment was utilized.

Without a current psychological examination and evaluation I would be unable to comment on her pres-

---

[4] "A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, *and if it was made in the regular course of business at or near the time of the act, condition or event, and if*, in the opinion of the court, *the sources of information, method and time of preparation were such as to justify its admission.*" Act of May 4, 1939, P. L. 42, §2, 28 P.S. §91b. (Emphasis added.)

ent condition; however, I feel certain that she is a very unstable individual who is incapable of assuming the responsibilities of homemaker and wife. Her ability to be an adequate mother would appear to be against reason and good judgment.

"Edward J. Patterson."

Dr. Patterson's statement is illuminating. It represents precisely the quality of evidence substantively necessary to support a finding of continued and irremedial parental incapacity—the quality of evidence capable of sustaining an order of involuntary termination of parental rights under the 1970 Adoption Act.

However, the document is not competent evidence. Since Dr. Patterson was not present at the subject proceeding, his out-of-court testimony suffers the same hearsay deficiency which should have prompted the exclusion of the summary prepared by the Child Welfare Service. In addition, as the writing is proffered as the opinion of an expert, the fact of Dr. Patterson's absence did not permit his qualification as a competent expert witness.[5]

While generally, on appeal, considerable weight is given to the findings of fact which are based upon evidence tendered in an action before a judge sitting without a jury, the court below was not warranted in basing its findings on unreliable testimony. Since the evidence presented for the purpose of terminating appellant's parental rights in her children is untrustworthy, and because we are so mindful of the critical importance of the adjudication of these rights and the well-being of the children, we will remand this matter

---

[5] The witness must state his qualification and the source of his knowledge. *Massachusetts Bonding & Insurance Co. v. Johnston & Harder*, 343 Pa. 270, 22 A. 2d 709 (1941). The witness must show special knowledge of the very question upon which he promises to express his opinion. *Sweeney v. Blue Anchor Beverage Co.*, 325 Pa. 216, 189 Atl. 331 (1937).

to the court below for the purpose of conducting a proceeding not inconsistent with this opinion.

The order of the Common Pleas Court is vacated and the matter remanded.

Mr. Justice ROBERTS concurs in the result.