**Farkas Adoption**

*Andrew Regule,* for petitioner.
*Carl Moses,* for respondent.

ACKER, J., March 5, 1973.—This matter came for determination arising from a petition for involuntary termination filed pursuant to the Adoption Act of July 24, 1970, P.L. 620 (No. 208), 1 PS §101, et seq. Respondent, Joseph Farkas, is an inmate of a Pennsylvania State Correctional Institution and was returned to Mercer County for the purpose of raising objection and testifying in opposition to the petition for termination. From the testimony taken this court makes the following

### FINDINGS OF FACT

1. Joseph Paul Farkas, Jr., the minor child, was

born on July 19, 1968, as a result of a union between petitioner and respondent who were married on March 1, 1968. The parties remained married until petitioner obtained a divorce on November 30, 1970.

2. Petitioner married her present husband, who desires to adopt the child, on December 30, 1970.

3. Subsequently, the respondent married as well.

4. The parties to this matter became separated in June of 1970 when petitioner filed for divorce and a support order was entered against respondent for the child in the amount of $15 per week. The last payment pursuant to the order was made on October 21, 1971, but the check was not cashed and cleared until October 26th, being in the amount of $60.20. As of October 11, 1971, respondent was in arrears in the amount of $170, but the $60.20 payment was made thereafter.

5. On October 22, 1971, respondent was confined in the Mercer County Jail and subsequently transferred to Warren State Hospital for study. He was returned on December 2, 1971, and was released from incarceration on December 10, 1971. He was, however, confined again on January 18, 1972, for an armed robbery, was subsequently tried for that offense, as well as sodomy with a child, and was sentenced and was transferred to a State penal institution on August 14, 1972, where he has remained continuously thereafter.

6. Up to the time of his being charged with sodomy upon his second wife's two and one-half year old child, during the summer of 1971 he visited the subject child regularly. At that time, however, petitioner advised respondent that he could no longer visit the child. The last visit by respondent of the child was in September of 1971. Upon returning from Warren State Hospital and being released from incarceration, respondent re-

quested permission to come to petitioner's home for the purpose of taking the child to his parents' home but this was refused.

7. In December of 1971, respondent called petitioner from the Mercer County Jail asking to talk to his son but petitioner refused and called the district attorney who contacted the jail to inquire as to what type of a phone call had been made to disturb petitioner.

8. In that petitioner had serious felony charges pending against him, he did not thereafter attempt to make any further phone calls.

9. At Christmas of 1971, respondent and his family secured several toys for the child and his sister attempted to deliver these, but, by telephone, was informed by petitioner that she would not accept them for the child.

10. On November 19, 1972, respondent wrote to the Domestic Relations Division of the Mercer County Court requesting that his mother and father be able to visit his son. In this letter, which is respondent's exhibit B, he recites that he talked with his ex-wife a few months ago prior to November 19, 1972, and that she told him that he could never see the child again as well as the rest of his family. He requested that the domestic relations division check into the matter, and he wanted to know what could be done to make visits by his parents possible. He gave the name of his parents and their address and requested to hear from domestic relations as soon as possible.

11. On November 21, 1972, by respondent's exhibit D, the then director, H. W. Miller, responded to Joseph P. Farkas at Bellefonte, Pa., advising him that inasmuch as his son was in the custody of the child's mother and that she refuses visitation, there is little that can be done until he is released from custody.

12. Accepting the advice from domestic relations, he did not subsequently attempt to contact his child or provide presents or do other things of that nature.

Petitioner acknowledges that subparagraph (1) of section 311 of the Adoption Act of July 24, 1970, alone can be used under the facts of this case, for the child had not been without essential parental care as is necessary for application of subsection (2). Therefore, the issue is whether respondent by conduct continuing for a period of at least six months either has evidenced a subtle purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties. Petitioner relies upon our opinion in Adoption of Terry Lee Hall, Jr., 12 Mercer 116 (1972). In that case, however, there had been no attempted contact of any type for much over six months by respondent of the child. This salient difference in itself is sufficient to distinguish the cases. Here, respondent wrote to domestic relations for its assistance to contact with the child. The effort was within six months of the date of the petition, the latter being filed February 6, 1973.

If relief is to be granted it must be upon the contention that respondent has refused or failed to perform parental duties. The mere fact of incarceration does not establish abandonment: Welker's Adoption, 50 D. & C. 573 (1944); In re: Adoption of Julia Ann Grabowski, 24 Westmoreland 162 (1942); and Adoption of Terry Lee Hall, Jr., supra. This respondent attempted to support his child as long as he was not incarcerated. It is true that he was somewhat behind but not sufficiently to show a lack of concern or interest for the child. The turning point of attention for the child was his involvement in the sodomy case when his wife directed that he should no longer see the child. From that time, it was useless for him to attempt to assume his parental duties and responsibilities for

his efforts were turned aside and would be turned aside in the future.

Our Supreme Court has recently declared that the termination by the law of a natural parent's rights to his child on the ground of abandonment is one of the most severe steps the court can take. The finality of the termination and the harsh connotation of a finding of "abandonment" carry great emotional impact on both the child and the parent. For this reason our law has been unwilling to tell a child that he has been "abandoned" by a natural parent, and has been unwilling to label a parent as one who has "abandoned" his child unless the record clearly warrants such a finding. See Jones Appeal, 449 Pa. 543, 297 A.2d 117 (1972).

In order to warrant a termination, the record must clearly indicate that it is justified: Vaders Adoption Case, 444 Pa. 428, 282 A.2d 359 (1971).

The failure of a parent to see a child may be excused where the other parent having custody warns the father that she does not wish him to have custody or come around the residence where the child is then living. Even where respondent voluntarily remains away by agreement so she would not upset the child, the six-month period of abandonment cannot run: Sarver Adoption Case, 444 Pa. 507, 509, 281 A.2d 890 (1971).

It is very difficult in cases of this type not to confuse the issue as to the best welfare of the child with that of abandonment. Fortunately, this child apparently has a solid home and a man who has come to be pictured as his father and who has assumed the responsibilities of a father. All of that, however, does not permit this court to ignore the clear testimony that the father and his family were denied the opportunity to have any form of relations with the son. Therefore, it is the conclusion of this court that there has not

been an abandonment or a failure or refusal to perform parental duties.

Hence, the order previously entered by this court on March 5, 1973, which it now reaffirms.