## In re Rinehart

*Chester Gitt Schultz*, for petitioner.

*Donald S. Marritz*, of *Legal Services, Inc.*, for respondent.

MacPHAIL, *P. J.*, July 3, 1975—Adams County Children's Services has filed a petition for involuntary termination of the rights of the natural mother and putative father of Richard Allen Rinehart under the provisions of section 311 of the Adoption Act of July 24, 1970, P.L. 620 (No. 208), 1 P.S. §311.[1] A hearing has been held and briefs have been filed by counsel.

From the record it will appear that Richard was born December 17, 1971. His mother is presently 30 years of age. Three days after the child was born it

---

1. There was inadequate notice to the putative father. At the hearing we indicated that if we ruled in petitioner's favor as to the mother a further hearing could be held.

was voluntarily delivered by the mother to Adams County Children's Services for emergency foster home care because the mother was going to jail. The child was returned to its mother on May 15, 1972, at her request. On July 10, 1972, the mother voluntarily placed the child in the custody of Adams County Children's Services under a voluntary placement petition. On October 2nd, the child was returned to the mother at her request. On October 10, 1972, the mother wanted the agency to pick up the child but when they arrived to do so, she said everything had been worked out. However, on November 27th, the mother again called the agency and said she could no longer take care of the child and the child was thereupon returned to foster home care. In August of 1973, the mother called and wanted the child returned to her but this was not consummated, even though an attempt was made, because of a drinking problem on the part of the putative father in the home where the child would stay. In October of 1973, the child was returned to the mother. Six days later she asked Adams County Children's Services to take the child back. In February 1974, the mother asked for the child's return to her and her wish was granted. On July 23, 1974, the child was voluntarily returned by the mother to the agency and the child remains in foster care at the present time.

On two occasions, in December of 1973 and July of 1974, the mother filed petitions for voluntary relinquishment of her parental rights. However, both petitions were withdrawn by the mother before a hearing could be held.

The mother does not deny the receiving and relinquishing of custody as testified to by petitioner, but she does say that every time she returned the

child to the agency she had valid reasons for doing so. The mother has a fifth-grade education, virtually no financial support other than what she receives from the Department of Welfare and she suffers from a nervous condition. She testified that at the time of the hearing she was taking valium. The putative father owns the trailer in which the mother lives and has been in and out of the home depending upon his personal whim. The mother says that the putative father's conduct has caused many of her problems with her child but that that relationship (with the putative father) has now been severed.

A letter was introduced into evidence by petitioner wherein the mother wrote to the agency (on December 3, 1973) that the boy was just not happy when he was with her because she could not give him the love he needed. Her letter also explains in very pitiful terms her feelings of guilt by reason of her inability to give him the love she knows he needs. The mother has had two other children. The maternal grandmother is presently raising one of those children and the other has been adopted. Between 1971 and the time of hearing, the mother had sent one Christmas present and no birthday cards or presents to her child. However, it was admitted by the witness for petitioner that the mother had made numerous phone calls and had written a number of letters to Adams County Children's Services about her child.

Petitioner urges that something must be done to provide the child with some stability at this point in his life. The mother urges that she has made some significant changes in her manner of living which would now give her a better opportunity to raise her child. Whether or not any psychological damage

has been done to the child by reason of the shifting back and forth of custody does not appear from the record. A reference was made to a psychological examination of the child but apparently there was nothing significant in the report because no further reference was made to it, nor was the person who examined the child called to testify.

Reference is also made in the record to a psychiatric evaluation made of the mother. We permitted counsel for the mother to look at the report during the course of the hearing. We did not personally look at the report for the reason that the information contained therein would not be admissible under the holding of the Appeal of Sarah M. Jones, 449 Pa. 543 (1972).

Petitioner has proceeded under both subsections of section 311. We think it quite apparent that the evidence in this case falls short of proving that the mother has evidenced a *settled* purpose of relinquishing her claim to the child. In fact, the evidence is very much to the contrary. We also have some difficulty in concluding from the evidence that the mother has *refused* to perform parental duties. The question is whether or not she has failed to *perform* those parental duties. The developing law in this area was summarized in In re Adoption of McAhren, 460 Pa. 63, 331 A. 2d 419 (1975) at pages 422 and 423:

" . . . in view of the irreversible nature and serious emotional impact of the involuntary termination of parental rights, such action is not authorized unless a preponderance of the evidence clearly warrants it. . . . Parental duties by definition must be comprised of more than one responsibility. Pennsylvania law has recognized that not only is there a duty to love, protect and support one's child

. . . [citing cases], there is also a duty to maintain communication and association with that child . . . [citing cases]. Consequently, being a parent is more than a passive state of mind or a financial obligation; rather 'it is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern. . . . [A parent] must exert himself to take and maintain a place of importance in the child's life.' "

In In re Adoption of Farabelli, 460 Pa. 423, 333 A. 2d 846 (1975), the court, after reiterating what it had said in the McAhren case, supra, added (at p. 850): "These principles, however, are necessarily subject to the qualifications that the measures taken by the parent to demonstrate his interest and affection must be viewed in light of the existing circumstances." It was also said in In re Adoption of McCray, 460 Pa. 210, 331 A. 2d 652 (1975) (at p. 655): ". . . our inquiry must turn to whether this [parent] has performed his affirmative duties as fully as possible *under his particular circumstances*." (emphasis ours).

In the present case one could look upon the events testified to by the witness for petitioner and conclude that this demonstrates from petitioner's point of view a failure to perform parental duties. However, it could be argued with equal force from the mother's point of view that she did all she could in view of her "existing circumstances." With the evidence in such a delicate balance, we must conclude that petitioner has not carried its burden of proof by the preponderance of evidence.

Subsection 2 of section 311 was construed in In re Geiger, 459 Pa. 636, 331 A. 2d 172 (1975), where the court held that to sustain its burden of proof petitioner must show: (1) repeated and continual

incapacity, abuse, neglect, or refusal on the part of the parent, (2) the fact that the incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control and subsistence and (3) the cause of the incapacity, abuse, neglect or refusal cannot or will not be remedied. In Jones Appeal, 449 Pa. 543, 297 A. 2d 117 (1972), the court said that, while this subsection must be viewed as an expansion of the court's powers to terminate parental rights under proper circumstances, nevertheless, the courts should not disturb the parent-child relationship in the absence of "compelling evidence of *repeated and continued* incapacity, abuse, neglect or refusal' to provide essential care." From the evidence in the case before us, we can quickly eliminate "abuse" because there has been none. While some of the evidence may indicate neglect or refusal on the part of the parent, we do not feel that there has been "compelling evidence" of those circumstances.

We are quite concerned about the incapacity of the mother to adequately perform her parental rights. She has tried four times and each time *she* realizes she has failed. However, in each instance she has called in the child care agency of her own free will to make sure that the child was properly cared for. In her own mind, at least, she says that the factors which contributed to her inabilty to cope with her child have now been eliminated. As we noted previously herein, we have no evidence of whether or not the mother is capable of remedying her former condition; except, of course, that each time she asked to have the child returned to her she obviously thought then that the conditions had been remedied and, in fact, they were not. Thus, while the evidence may show a continued incapac-

ity, it does not demonstrate an irremediable incapacity. See Sheaffer Appeal, 452 Pa. 165, 305 A. 2d 36 (1973).

Petitioner in this case has certainly gone the "extra mile" with the parent. We can well appreciate their frustration and their genuine concern for the child's welfare and its best interest. However, we are not certain whether the welfare of the child is a factor we should consider in a proceeding to terminate parental rights involuntarily. Whereas the Supreme Court in Appeal of Diane B, 456 Pa. 429, 321 A. 2d 618 (1974), cited Adoption of JRF, 27 Somerset 298 (1972), with favor and one of the holdings in the Somerset County case was that the welfare of the child was a consideration under the new provisions of the Adoption Act relating to the termination of parental rights, the same court said in the McAhren case, supra, that until the issue of the involuntary termination of parental rights *was resolved*, the question of the best interest of the child never arises. With the law at the present time being rather inconclusive, we feel that it would be inappropriate for us to reach a decision based solely upon the best interests or welfare of the child, although in our own minds we are well satisfied that this should be not only a consideration but the most important consideration.

Having found that petitioner has failed to meet its burden of proof under subsection 1 or subsection 2 of section 311, and being of the opinion that the welfare and best interests of the child are not enough at the present time to decide the issue of the termination of parental rights, we will enter the following

## ORDER

And now, July 3, 1975, the petition for involuntary termination of parental rights is denied. Costs to be paid by the county.