**Involuntary Termination of Parental Rights to R.B.W.**

*Regina O. Thomas*, for petitioner.
*Janet F. Stotland*, for respondent.
*Thomas E. Byrne, III*, guardian ad litem for respondent.
*John A. Mullican*, for minor (by appointment of the court).

CIPRIANI, *J.*, September 9, 1975—A petition for involuntary termination of parental rights was filed by Lutheran Children and Family Service of Eastern Pennsylvania seeking to terminate the parental rights of F.K. as to her minor daughter, R.B.W. A guardian ad litem was appointed for respondent, who is mentally ill, and a child advocate was appointed for the minor. The matter proceeded to hearing with respondent present in court with counsel.

The petition alleges as grounds for termination the continued incapacity of respondent and the unlikelihood that this capacity could, or would be, terminated, and, after hearing and testimony given by the parties and witnesses, the court makes the following

## FINDINGS OF FACT

1. R.B.W. is a minor female of the age of six years, having been born April 3, 1969, at Philadelphia State Hospital.

2. Immediately after her birth, the child was placed in the care of her grandmother, Mrs. L.W.,

for three months, and was then placed with the Department of Public Welfare where she remained at the Callowhill Child Care Center from July 3, 1969, to October 22, 1970.

3. On October 27, 1970, the Hon. Hazel H. Brown, Judge of the Court of Common Pleas of Philadelphia County, committed the child to the Department of Public Welfare of the City of Philadelphia, being court No. 102563, Juvenile No. 104894.

4. R.B.W. has been under the care and supervision of petitioner, Lutheran Children and Family Service of Eastern Pennsylvania, from October 22, 1970, to the present time, during which period she has been cared for in a foster home.

5. On November 22, 1974, the Department of Public Welfare of the City of Philadelphia, consented to the transfer of custody of R.B.W. to the Lutheran Children and Family Service of Eastern Pennsylvania.

6. Respondent, F.K., formerly known as F.W., is an adult individual of the age of 35 years, and is the mother of R.B.W.

7. Respondent has a history of hospitalization for mental illness since at least the year 1969 when R.B.W. was born, and several subsequent commitments to the Philadelphia State Hospital on or about May 1970 and a court commitment on August 20, 1971, under section 406 of the Mental Health and Mental Retardation Act.

8. A request to continue the matter indefinitely on the ground that the mother, F.K., was incompetent was denied by the court.

9. The court did, on December 24, 1974, appoint Thomas E. Byrne, III, Esq., as guardian ad litem for said F.K.

10. The court did appoint John A. Mullican, Esq., as child advocate for the minor, R.B.W.

11. There is a stipulation of counsel on record that:

(a) Respondent was admitted to Pennsylvania Hospital Pavilion on March 10, 1971, and discharged on April 23, 1971, with provision for outpatient treatment at the Larchwood Clinic.

(b) Respondent was admitted to Philadelphia Psychiatric Center on July 21, 1973, on commitment under section 406 of the Mental Health and Mental Retardation Act of October 20, 1966, Sp. Sess., P.L. 96, 50 P.S. §4406, and she was transferred to Philadelphia State Hospital on August 30, 1973.

(c) Respondent was treated as an out-patient in the clinic of Philadelphia Psychiatric Center on multiple dates from March 8, 1973, to April 14, 1975.

12. Respondent was admitted on February 6, 1974, to Philadelphia Psychiatric Clinic and upon discharge on March 1, 1974, was placed on outpatient services. She was to continue to receive medication, to wit, prolexin and enanthate by injection.

13. On September 11, 1974, respondent was again admitted to the Philadelphia Psychiatric Clinic when she continued to make unannounced visits to the clinic and behaved in a bizarre manner with delusions and hallucinations.

14. Respondent was discharged from Philadelphia Psychiatric Clinic on October 14, 1974, with diagnosis of paranoid schizophrenia and was to continue on medication of meloril and congentin.

15. Respondent presently continues on said medication and is able to exercise control of her

impulses if her medication is taken, but she is not dependable and is erratic as to the taking of said medication.

16. James Winston Sapp, Jr., M.D., a psychiatrist, has been treating respondent since February 6, 1974, when she was an in-patient at Philadelphia Psychiatric Center and she has continued under his care.

17. Dr. Sapp has diagnosed respondent's present condition as paranoid schizophrenia with a prognosis for recovery and for her ability to provide a stable emotional environment for herself being "poor."

18. Dr. Sapp is of the opinion that respondent is unable to provide care for a child, since her illness makes it difficult for her to relate to others.

19. Dr. Sapp is of the further opinion that respondent's illness is long term and functional in origin, and he gives no encouragement that respondent would improve with treatment.

20. Thomas Radecki, M.D., a psychiatrist, treated respondent at Philadelphia General Hospital from March 6, 1975, to March 31, 1975. This admission was voluntary and based on respondent having bizarre delusions.

21. On March 31, 1975, respondent was to leave on a pass and return, but she has failed to return.

22. Dr. Radecki is of the opinion that respondent, at the time of her leaving the hospital on March 31, 1975, was suffering from chronic undifferentiation schizophrenia, and her prognosis is "poor."

23. Respondent has evidenced a continuous interest and concern for her daughter during the entire period that the child has been in foster care.

24. Respondent presents herself before the court as an adult, apparently physically healthy.

25. Respondent has provided no support for the child since birth.

26. Respondent, during the taking of testimony, constantly interrupted witnesses, made comments to the court during the entire proceedings, and lapsed repeatedly and unpredictably into unintelligible explanation of the testimony of witnesses.

27. Respondent testified briefly on her own behalf only to the extent of stating that she wanted to care for her child.

28. Respondent suffers from a chronic mental illness of at least six years duration, which renders her incapable of relating normally to the world around her or to any person in contact with her.

29. Respondent lacks the capacity to provide essential parental care, control and subsistence necessary for the physical or mental well being of her child.

30. The conditions and causes of the parental incapacity suffered by respondent cannot, or will not, be remedied by her.

31. The best interests of the public and of the child will be served by a termination of the parental rights of respondent.

## DISCUSSION

Section 311 of the Adoption Act of July 24, 1970, P.L. 620 (No. 208), art. I, sec. 101 et seq., 1 P.S. §101 et seq. (hereinafter referred to as the Adoption Act), provides for involuntary termination of parental rights on the ground that, inter alia: "2. The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the

incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parents."

The instant case deals with an alleged emotional incapacity rather than some physical incapacity. The field of psychiatry is not an exact science and the court must rely on the opinion of psychiatric experts.

The testimony reveals that the mother has been under psychiatric care for about six years. Two of the treating psychiatrists gave testimony, namely, Dr. Sapp and Dr. Radecki. Dr. Sapp diagnosed respondent's condition as "paranoid schizophrenia" and Dr. Radecki diagnosed her condition as "chronic undifferentiation schizophrenia" and both stated that her prognosis for recovery is "poor." This court feels that the evidence of history of the mother's illness, together with her appearance and conduct at the hearing, does provide the basis for an order terminating respondent's parental rights.

In the case of Jones Appeal, 449 Pa. 543, 297 A. 2d 117 (1972), there was no testimony by a physician at the hearing. Instead, a written statement was presented to the court, setting forth respondent's mental condition and prognosis. The court reversed the order of termination of parental rights, but on page 551 of the opinion, the court stated:

"Dr. Patterson's statement is illuminating. It represents precisely the quality of evidence substantively necessary to support a finding of continued and irremedial (sic) parental incapacity—the quality of evidence capable of sustaining an order of involuntary termination of parental rights under the 1970 Adoption Act."

In the instant case, there was produced two psychiatrists who testified as to respondent's mental condition, thereby meeting the requirement set forth in Jones Appeal, supra.

This is a sad case of a mother who manifests affection for the child but whose mental illness prevents her from affirmatively performing her parental responsibilities. She is to be pitied and does have the sympathetic understanding of this court.

The child in question is six years of age and will need supervision, care and guidance as well as emotional support, all of which respondent is incapable of providing. The court must, and does, consider interest of the child in addition to being fully mindful of the rights of respondent as parent.

Section 311(2) of the Adoption Act provides for termination if there is "repeated and *continued incapacity*, abuse, neglect or refusal of the parent . . . and the conditions and causes of the *incapacity*, abuse or neglect or refusal *cannot* or will not be remedied by the parent." (Emphasis supplied.)

The question may be posed as to whether the legislature intended to sever parental rights and responsibilities regardless of fault. A reading of the 1970 Adoption Code clearly indicates an intention by the legislature to terminate parental rights despite a desire by the parent to perform parental obligations: Loar Adoption, 56 D. & C. 2d 618 (1972).

Where it has been shown that respondent is suffering from chronic paranoid schizophrenia and the chances of her condition improving are about one in ten, the parental rights will be terminated. In re C.R., 66 D. & C. 2d 155 (1973). It has also been held that the parental rights will be terminated where the legal father is unable to care for his chil-

dren due to a service-connected disability which will continue for an indefinite period: Young Adoption, 23 Fiduc. Rep. 51 (1971).

The evidence in this case supports the finding that respondent-mother is mentally ill and her prognosis for recovery is poor. She will continue to be incapable of providing essential parental care and control of the child for an indefinite time.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter.

2. The evidence is sufficient to establish that the repeated and continued incapacity of respondent has caused the child, R.B.W., to be without essential parental care, control and subsistence necessary for her physical and mental well-being and that the conditions and causes of the incapacity cannot, or will not, be remedied by respondent.

3. Petitioner is entitled to the entry of an order terminating the parental rights of respondent in the child.

## ORDER

And now, September 9, 1975, upon consideration of the petition for involuntary termination of parental rights filed by Lutheran Children and Family Service of Eastern Pennsylvania, hearing and testimony by witnesses and in accordance with the findings of fact and conclusions of law, it is hereby ordered, adjudged and decreed that the parental rights of respondent, F.K., in regard to the child, R.B.W., be and they are hereby terminated, and that further proceedings with respect to the custody and adoption of said child may be had without further notice to or additional consent of F.K.