445 A.2d 162

**In the Matter of the ADOPTION of J. S. H.**

**Appeal of: T. V. H.**

Superior Court of Pennsylvania.

Argued Nov. 9, 1981.

Filed April 30, 1982.

Petition for Allowance of Appeal Denied Oct. 18, 1982.

Melvin Toran, Erie, for appellant.

William Dopierala, Erie, for participating party.

Before BECK, JOHNSON and POPOVICH, JJ.

POPOVICH, Judge:

This appeal is from the final decree of the Court of Common Pleas of Erie County, Orphans' Court Division, involuntarily terminating the parental rights of appellant, T. V. H., in her natural son, J. S. H.

On June 26, 1980, a petition was filed in the Court of Common Pleas of Erie County, Orphans' Court Division, by the Children's Services of Erie County (Children's Services), appellee herein, seeking the involuntary termination of the parental rights of appellant with respect to her son, J. S. H. On October 6, 1980, a hearing was held and the Orphans' Court entered a decree involuntarily terminating appellant's parental rights under § 311(1) and § 311(2) of the Adoption Act. 1 P.S. § 311 (Supp.1976) (current version at 23 Pa.C. S.A. § 2511(a)(1)–(2) (Pocket Part 1981–82)). After exceptions were filed and orally argued, the Orphans' Court ordered that appellant be given another opportunity by Children's Services to visit with her son to determine whether she properly could care for the child. On May 18, 1981, Children's Services filed a motion to terminate visitation. A second hearing was held, and, on June 10, 1981, the Orphans' Court entered a final decree dismissing appellant's exceptions and reinstating the decree of October 6, 1980, thereby terminating appellant's parental rights. This direct appeal followed.

On appeal, appellant first contends that the evidence was insufficient to establish either that she failed or refused to perform her parental duties for a period of at least six months or that conditions and causes of her incapacity, neglect or refusal cannot or will not be remedied. Second, appellant argues that the actions of Children's Services thwarted her efforts to perform parental duties.

For the following reasons, we affirm the lower court's decree.

To begin with, our standard of review in cases of involuntary termination of parental rights is limited to determining whether the lower court's findings are sup-

ported by competent evidence. *In re L.A.G.*, 490 Pa. 85, 415 A.2d 44 (1980). In making this determination, we are obliged to "[accept] as true all the evidence supporting the findings and all reasonable inferences therefrom." *In re D.K.W.*, 490 Pa. 134, 138, 415 A.2d 69, 71 (1980) (*quoting In re William L.*, 477 Pa. 322, 340, 383 A.2d 1228, 1237, *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978)). Absent an abuse of discretion, findings of the Orphans' Court must be sustained even though the record could support an opposite result. *In re D.K.W., supra; In re William L., supra.* In applying this standard to the instant case, the record discloses the following facts:

J. S. H. was born on August 19, 1978. When he was six weeks old, J. S. H. was adjudicated a dependent child under the Juvenile Act because of his failure to thrive and appellant's failure to provide adequate medical care.[1] 42 Pa.C. S.A. § 6302 (1981 Pamphlet). The child was placed in the care and custody of Children's Services and, at the age of seven weeks, was placed in the home of a foster mother with whom he currently resides.

The child has been diagnosed as having neurological disability, developmental delays, and physical problems. It also has been established that the child is not within normal intelligence limits and has a limited intellectual range and capacity.

Following a dispositional hearing on November 22, 1978, the Orphans' Court ordered that the child remain under the care and supervision of Children's Services for an indefinite period. Appellant was ordered to cooperate with mental health counseling and to participate in a child care program designed for mentally handicapped children and their par-

---

1. The Juvenile Act defines a dependent child as one who:
   (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals;
   (2) has been placed for care or adoption in violation of law;
   (3) has been abandoned by his parents, guardian, or other custodian;
   (4) is without a parent, guardian, or legal custodian[.] 42 Pa.C. S.A. § 6302 (1981 Pamphlet)

ents. Appellant attended mental health counseling for a short period of time, failed to recognize any problems and subsequently ceased attending. Appellant did not participate in the court-ordered child care program. Although appellant maintained that the primary reason she did not attend child care classes was because she did not drive and could not obtain a ride, she also stated that at that time, she did not feel that she needed parental training. (N.T. 10/6/80, pp. 38, 43).

In March and October 1979, the court established conditions for the reunification of appellant and her son. Both court orders required appellant to attend various types of counseling and also provided for visitation. Appellant never attended the required parental training program. Moreover, although appellant was afforded liberal visiting privileges, she declined to take full advantage of them. During the visits that took place in appellant's home, appellant often would not pay attention to the child. Overall, appellant's contact with her son was limited because "[appellant] would be off doing other things, getting papers together or playing with the dogs or paying attention to her boyfriend . . . ." (N.T. 10/6/80, p. 11).

From January 18, 1980, through April 7, 1980, appellant failed to contact Children's Services or visit with her son. On April 7, 1980, appellant's request for visitation was denied by Children's Services because of her failure to follow through with counseling or contact the agency.[2] Children's Services then filed a petition to terminate parental rights, and, following a hearing on October 6, 1980, the Orphans' Court granted the requested relief. After exceptions were filed and argued, the court ordered that appellant be given

2. Appellant attributes her failure to contact Children's Services or see her son to the fact that Children's Services was on strike during January and the first part of February 1980. The record reveals, however, that appellant's last visit occurred during the early part of the strike and appellant knew that she could contact the agency to schedule visitation. Therefore, we note that the strike was not an obstacle to appellant's either contacting the agency or visiting with her son.

another opportunity to visit with her son in order to determine whether she properly could care for the child.

Visitations held pursuant to this order took place in the child's foster home. During the first three visits, appellant had no interaction with her son and spent a majority of the allotted time playing with one of the other foster children. Appellant's infrequent attempts to interact with her son during subsequent visits were unsuccessful. The child responded to his mother with displays of erratic physical and emotional behavior. Specifically, the child would hide from and avoid appellant, and scream, kick, cry and pull out his hair when his mother attempted interaction. Appellant consistently failed to react to her son's outbursts and often began to play with one of the other foster children. Despite the unsuccessful and unsettling nature of the visits, appellant informed the caseworker that all the visits were going well, that she and her son had a very good rapport, and that there were no problems.

In May, 1981, Children's Services refused to allow appellant to visit with her son and filed a petition to terminate visitation. This action was prompted by complaints by the foster mother that the visits caused the child severe emotional and physical distress, including voiding and withdrawal symptoms, hyperventilating, bed-wetting, and sleeping difficulties. Following a hearing on appellee's motion to terminate visitation, the Orphans' Court dismissed appellant's exceptions and entered a final decree reinstating its October 6, 1980 order terminating appellant's parental rights.

Currently, appellant is unemployed, does not own or operate an automobile, and lives with her parents at Canadohta Lake, Union City. Appellant testified that she presently is attending parental classes but does not know how they are helping her other than that the classes "[teach her] more of how to ... try to reason with [a] child." (N.T. 6/3/81, p. 72).

Appellant now contends that the evidence was insufficient to support the Orphans' Court finding that she failed or

refused to perform her parental duties for a period of at least six months. We disagree.

Section 311(1) of the Adoption Act provides that parental rights may be terminated, following a hearing, when "[t]he parent by conduct continuing for a period of at least six months . . . has refused or failed to perform parental duties." 1 P.S. § 311(1) (Supp.1976) (current version at 23 Pa.C.S.A. § 2511(a)(1) (Pocket Part 1981–82)).

In determining whether a parent has refused or failed to discharge parental duties we must remember that:

"Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with her immediate and continuing physical and emotional needs). The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited."

*In re Adoption of Orwick*, 464 Pa. 549, 554, 347 A.2d 677, 680 (1975) (*quoting In re Smith's Adoption*, 412 Pa. 501, 505, 194 A.2d 919, 922 (1963)).

Moreover,

"Parenthood is not . . . a mere biological status, or passive state of mind which claims and declines to relinquish ownership of the child. It is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern . . . [A parent] *must exert himself* to take and maintain a place of importance in the child's life . . . ." *Appeal of Diane B.*, 456 Pa. 429, 433, 321 A.2d 618, 620 (1974).

*In re L.A.G.*, 490 Pa. 85, 90, 415 A.2d 44, 47 (1980) (emphasis added).

■ Instantly, our review of the record reveals sufficient evidence to support the Orphans' Court's conclusion that appellant failed to perform parental duties for a period well

in excess of the six month statutory minimum. Appellant's last visit with her son, prior to the filing of the petition to involuntarily terminate her parental rights, was on January 18, 1980. Children's Services' petition was filed on June 26, 1980, a period of six months and eighteen days after appellant's last visit. We have no doubt that appellant's conduct during the six month statutory period and throughout the two and one half years that her son has been in foster care, demonstrates a failure to perform parental duties within the terms of § 311(1).

At the age of six weeks, appellant's son was adjudicated dependent and placed in the custody of Children's Services. The child was diagnosed as having neurological disability, developmental delays, and some physical problems. Despite an awareness of her son's developmental lag, need for stimulation to promote learning, and physical problems, appellant, prior to the filing of the petition to terminate parental rights, made no attempt to undergo the counseling ordered by the Orphans' Court. Since 1978, appellant has complied only superficially with Children's Services' guidelines and conditions for reunification. Moreover, appellant has not attempted to familiarize herself with the therapy necessary for the child's developmental progress, thereby leaving the onus of this responsibility entirely to J. S. H.'s foster mother. From the time her son was adjudicated dependent, appellant, in effect, has demonstrated repeatedly a failure or refusal to recognize her son's problems and an inability to attend to his special needs. Throughout this time, appellant's only effort to discharge her parental duties has been to visit with her son periodically. *See In re William L.*, 477 Pa. 322, 333, 383 A.2d 1228, 1233, *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978) (parent has affirmative duty to work towards return of child placed in foster home).

When, as in the instant case, the evidence establishes that the parent has failed to perform her affirmative parental duties for a period in excess of six months, we must "examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light

of the totality of the circumstances, clearly warrants permitting the involuntary termination." *In re Adoption of Orwick*, 464 Pa. 549, 555, 347 A.2d 677, 680 (1975).

Here, appellant assigns her failure to undergo counseling to her inability to obtain rides to and from the counseling center located thirty miles from her home. The record indicates, however, that although appellant did not drive or own a car, appellant did not believe that parental counseling was necessary. Appellant stated that she attended individual counseling only because it was mandatory and that she had no problems that she felt required counseling.

Accordingly, we now cannot say that the Orphans' Court inadequately weighed or improperly passed upon the totality of appellant's circumstances. *See In re Burns*, 474 Pa. 615, 626, 379 A.2d 535, 541 (1977) ("A parent may not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.").

■ Appellant next maintains that the evidence failed to establish that the conditions and causes of her incapacity, neglect or refusal to care for the child cannot or will not be remedied. Again, we disagree.

Under section 311(2) of the Adoption Act, involuntary termination of parental rights may occur only upon a compelling showing of three factors:

"(1) repeated and continued incapacity, abuse, neglect or refusal must be shown;

(2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and

(3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

*In re Adoption of R.I.*, 468 Pa. 287, 293, 361 A.2d 294, 298 (1976) (*quoting In re Geiger*, 459 Pa. 636, 639, 331 A.2d 172, 174 (1975)).

The facts of this case offer sufficient support for the Orphans' Court's conclusion that "[appellant] does not have the capability and cannot acquire the capability to cope with and handle this particular child ...." (Orphans' Court Opinion at 4, 6/10/81, Record No. 8).

The child's physical condition at the time he was adjudicated dependent and removed from appellant compels a conclusion that he was exposed to "repeated and continued" parental neglect or incapacity to provide essential care and subsistence. The record also supports the finding that even though this child requires special care and attention, appellant has refused to learn how to attend to his special needs. Instantly, appellant's refusal to attend counseling, her inability to recognize the problems that surfaced during visitation, and her failure to comply with Children's Services' guidelines and conditions for reunification reveal her lack of ability and maturity to provide her son with essential parental care. Moreover, because appellant has failed to provide essential parental care for a period in excess of three years, the Orphans' Court permissibly could infer that appellant is not able to remedy the conditions and causes of her incapacity.

Finally, appellant contends that Children's Services acted to thwart her efforts to remain a positive factor in her son's life. We cannot agree with this contention.

For the past three years, Children's Services has developed and extensively set forth guidelines and conditions for appellant's reunification with her son. Following each visitation, appellant's caseworker talked to appellant and advised her how to improve the quality of her visits. Children's Services also provided appellant with the opportunity to obtain counseling for both herself and her son. *See In re Adoption of I. L. G.*, 492 Pa. 507, 424 A.2d 1306 (1981) (child care agency has no duty to provide rehabilitative services or to disclose possible consequences of failure to perform parental duties). Appellant, on the other hand, did not take advantage of the agency's facilities, yielded to every problem, and failed to exert herself in maintaining a

place of importance in her child's life. Hence, Children's Services did not thwart any attempt by appellant to reunite with her son.

Accordingly, the Order is affirmed.

BECK, J., files concurring opinion.

JOHNSON, J., files dissenting opinion.

BECK, Judge, concurring:

I concur but feel constrained to address myself to appellant's argument that Children's Services thwarted her effort to perform parental duties during the requisite six month period. See 1 P.S. § 311(1) (current version at 23 Pa.C.S.A. § 2511(a)(1)). The lead opinion notes that appellant did seek to visit her son one time during that period, but that she was refused visitation because of her failure to follow through with counselling.

The Pennsylvania Supreme Court has found that parental rights are not necessarily terminated even where there was no direct contact between parent and child for the statutory six month period. Such failure was excused where the parent exhibited persistence in the face of obstacles to that contact.

In In re Adoption of J. A. B., 487 Pa. 79, 408 A.2d 1363 (1979), the mother testified that she sought to visit her son many times, but the social services agency thwarted her overtures. The parents argued that their failure to perform parental duties resulted directly from the intransigience of the agency. The Supreme Court excused the period of no contact:

> The evidence in this case establishes that the agency discouraged the parents from maintaining contact with J. by averting their inquiries and advising them to wait until their other problems were under control before attempting to re-establish their relationship with him. It is apparent from the record that the agency viewed J. as the family's troublemaker and scapegoat and had determined

it was in the best interests of both family and child that he not be returned.

*Id.,* 487 Pa. at 90, 408 A.2d at 1368.

The Supreme Court in *Adoption of J.A.B.* applied a "totality of the circumstances" test in reversing a lower court decree terminating parental rights:

> The court's finding of an absence of direct contact between J. and his parents for a period in excess of six months is not disputed. However, this fact alone will not support a determination of failure to perform parental duties where the totality of the circumstances, including evidence of the parents' individual circumstances and any explanation offered by them, does not warrant termination of their rights.

*Id.,* 487 Pa. at 89, 408 A.2d at 1368.

Similarly, in *In re D. J. Y.,* 487 Pa. 125, 408 A.2d 1387 (1979), the natural mother of D. J. Y. attempted to contact her son but was thwarted in that attempt by the natural father and paternal grandparents. Again, although the orphans' court found the requisite six month period, it excused the mother's lack of contact, declined to terminate her parental rights, and dismissed the grandparents' petition to adopt their grandson. The Supreme Court cited *In re Burns,* 474 Pa. 615, 625, 379 A.2d 535, 540 (1977), in excusing the mother's failure to contact D. J. Y.:

> "the question whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case. A finding of abandonment, . . . will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship." (citations omitted)

*Id.,* 487 Pa. at 130–131, 408 A.2d at 1390.

In *Adoption of S.H.,* 476 Pa. 608, 383 A.2d 529 (1978), the orphans' court found that under a "totality of the circumstances" test the father's failure to contact his child was

excused because despite his persistence he had been thwarted by his former wife, her new husband and her mother:

> The father's extended attempts to locate his son after his wife left him, to persuade the mother to permit visitation, to send letters and gifts from prison to his son, to arrange for visitation through his new fiancee ... demonstrate the "reasonable firmness 'in declining to yield to obstacles ...'" which will preserve parental rights. *Adoption of McCray*, 460 Pa. [210] at 216, 331 A.2d [652] at 655.

*Id.*, 476 Pa. at 615, 383 A.2d at 533.

It is clear from the preceding authority that to safeguard his or her parental rights, a parent may not acquiesce in obstructive behavior by either the social service agency or the custodial parent. He or she must exhibit "reasonable firmness" in refusing to yield to such obstacles. *Accord In re M.A.K.*, 489 Pa. 597, 414 A.2d 1052 (1980).

As the lead opinion notes, appellant attempted only once during the six month period to visit her son. That request was denied because she had failed to comply with the requirements established for her by the social service agency. She did not persist in her effort to see her child and thus her behavior is distinguishable from the above cases where failure to contact the child for a period of six months was excused.

In the instant case, the agency fulfilled its responsibility in seeking to reunite mother and son; appellant decidedly did not. I therefore agree that the order of the lower court should be affirmed.

JOHNSON, Judge, dissenting:

This is an appeal by the natural mother from a Final Decree involuntarily terminating her parental rights in her three-year old son. A bench decree[1] had been issued on

1. At the conclusion of the hearing on October 6, 1980, the chancellor entered the following decree on the record:

> BY THE COURT: Well, the parental rights of [the natural mother] to [her son] are hereby terminated since the parent by conduct which has continued for a period of at least six months has failed

October 6, 1980 following a hearing on the petition[2] of Children's Services of Erie County (CSEC) to terminate her rights. Exceptions to the decree were filed and argument thereon was held on or about February 19, 1981.[3] At that time, the chancellor directed CSEC to give the mother reasonable opportunity to visit her son and deferred final action on the petition. On May 18, 1981, the chancellor terminated the reinstituted visitation pending a further hearing, acting upon an unverified Motion to Terminate

and refused to perform parental duties; the repeated and continued incapacity, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being, and the conditions of the neglect cannot or will not be remedied by the parent.
The Court will recess.

Appellant has improperly, I believe, incorporated this decree as Appendix A to her Brief, inasmuch as the original record contains a two-page form decree signed by the lower court but containing numerous interlineations. It is worth noting that although the October 6, 1980 decree in the bound record finds that "the conditions *and causes of the incapacity, neglect or refusal* cannot or will not be remedied by the parent" [emphasis added], the bench decree speaks only to the "*conditions* of the *neglect*" [emphasis added]. See footnote 2, *infra.*

2. I note, with disapproval, that the Petition for Involuntary Termination of Parental Rights filed with the orphans' court on June 26, 1980 is a "form petition" (Form A–4) containing a large number of words and phrases whch have been either struck through with typewriting or crossed out by pen and ink. The decree attached to the Petition also contains whole sections which have been crossed out, both with blue and with black ink. An examination does not permit any conclusion as to whether any, some or all of these deletions and amendment(s) were made by counsel for CSEC, the lower court, or some other party. The Petition does not contain all of the allegations required by Supreme Court Orphans' Court Rule 15.4(a). I would submit that the demanding standards of the Adoption Act, the strong policy of restraining from interfering with the family enunciated both by our Legislature and our courts, and the need for adequate review both by the orphans' and appellate courts require a higher standard of work product than presented here. *Cf. In Re William L.,* 477 Pa. 322, 328–35, 383 A.2d 1228, 1231–34 (1978), *U.S. cert. denied, Beatty v. Lycoming County Children's Services, et al; Lehman v. Lycoming County Children's Services, et al.,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).

3. No transcript of this proceeding has been brought to our attention, but was discussed in the transcript of testimony of the second termination hearing. N.T. 6/3/81, pp. 46–7.

Visitation[4] presented by CSEC. On June 3, 1981, a hearing was held and, on June 10, 1981, the chancellor entered his Final Decree from which this appeal is brought.

The chancellor based his initial decree[5] on his finding that, as to the mother:

a) she, by conduct which continued for a period of at least six (6) months has refused and failed to perform parental duties;

and

b) the repeated and continued incapacity, neglect or refusal of the parent has caused such child to be without essential parental care, control or subsistence necessary for the physical or mental well-being of said child and the conditions and causes of the incapacity, neglect or refusal cannot or will not be remedied by the parent;

as grounded in § 311(1) and § 311(2) of the Adoption Act of 1970.[6]

To be determined on this appeal is whether the orphans' court properly applied those sections of the Act to the facts in the instant case. While our scope of review is limited to a determination of whether the orphans' court's decree termi-

4. The Motion to Terminate Visitation, filed with the Clerk of Orphan's Court on May 18, 1981, contains numerous averments of facts not appearing of record in the action, contains no verification, and appears to be in clear violation of Rule 1024(a) of the Pennsylvania Rules of Civil Procedure. See Orphans' Court Rule 3.1, Pa.R.Civ.P. Rule 1501. Although the lower court's Opinion of June 10, 1981 refers to a hearing held on that Motion on June 3, 1981 "concerning the activities leading up to the Motion", I note the only order entered is attached to the Motion and filed May 18, 1981, terminating the reinstituted visitation.

5. Although the chancellor characterized his Decree of June 10, 1981 as a "Final Decree", there is nothing about either the form or contents of the earlier decree entered October 6, 1980 to suggest anything other than a final decree. However, since exceptions were filed and argued, and since the chancellor appears to have reinstituted visitation on or about February 19, 1981 (see text, at footnote 3, *supra*), without filing any order thereon, the decree of October 6, 1980 may properly be considered a decree nisi.

6. Act of July 24, 1970, P.L. 620, No. 208, art. III, §§ 311(1), 311(2), 1 P.S. §§ 311(1), 311(2) (Supp.1980–81).

nating parental rights is supported by competent evidence, *In re D.K.W.*, 490 Pa. 134, 415 A.2d 69 (1980), the court's inferences, deductions and conclusions are subject to review. *In re Adoption of J.A.B.*, 487 Pa. 79, 408 A.2d 1363 (1979).

A careful review of the chancellor's four page opinion filed June 10, 1981, the Petition filed by CSEC, and the entire trial transcript compels the conclusion that competent evidence was not presented to support a decree of termination of parental rights under either § 311(1) or § 311(2) and that the inferences and conclusions of the chancellor were in error. I would, therefore, vacate the lower court decree.

## *§ 311(1)*

In the instant case, the six month period during which CSEC alleges the mother refused *and* failed to perform parental duties elapsed from the mother's last visit with the child on January 18, 1980 until the filing of the form petition for termination on June 26, 1980. The child had been taken from the mother at the age of one month by CSEC and was adjudicated dependent two weeks later under circumstances where it was found that the child had failed to thrive. The child has remained in placement ever since.

The child suffered from a developmental lag and had a blockage in the lungs which induced vomiting on occasion when improperly fed. In addition, the child was diagnosed as having cerebral palsy.

Between the time of the removal of the child from its mother's home and early 1980, regular, frequent visits occurred between the mother and the child. During early 1980, the protective service caseworker—who was the only witness for the petitioner at the first hearing—was on strike along with her colleagues. Normally, subsequent visits between the mother and child were arranged at the conclusion of each visit in the foster home. The January 18, 1980 visit had been attended by a case aid from CSEC and no future visit was arranged. The caseworker conceded that the mother had requested visitation on April 7, 1980. This request was refused by the caseworker, in spite of a court

order dated February 1, 1980 ordering visitation, on the grounds that the caseworker had not had any contact from the mother since before the strike and the caseworker's belief that a visit at that time "would not be in the best interest of the child."

On April 11, 1980, an order of court was issued placing all future visitation "at the discretion of the agency." [7]

All of the visitations between the mother and her child were of short duration, lasting between fifteen and ninety minutes. In October 1979, a physician member of the multidisciplinary team had recommended that the mother be afforded the opportunity to regain her son for a one-week trial period, with daily supervision by the caseworker. When asked at trial why this recommendation had not been implemented, the caseworker testified:

First of all, the agency did not agree with that. We did not feel that it was in the best interest of the child, and based on the fact that the child had not been living with his mother and that she had only been visiting with him for maybe an hour a week, we felt it would be detrimental to the child's health.

Early on, an evaluation had been made of the home in which the mother was residing. The caseworker found the home situation favorable, but felt that the adults with whom the mother was residing had been "uncooperative" with the

7. At the termination hearing held October 6, 1980, the witness for the petitioner, CSEC, read into the record orders of court bearing dates of 10/4/78, 11/22/78, 3/23/78, 10/19/79, 2/1/80 and 4/11/80. None of these orders were identified as to the proceedings in which they were entered, nor were copies of them made a part of the original record at No. 111, In Adoption 1980, from whence this appeal is taken. Though the order of 4/11/80 directs CSEC to "proceed with filing a petition for termination of parental rights" [as read into the record on this appeal] there is nothing before this Court to explain why such a directive may have been given nor why CSEC did not proceed with filing a petition until June 26, 1980. It does appear that the refusal of CSEC to grant visitation following the mother's request on or about April 7, 1980 was, temporarily at least, in violation of the then-outstanding order of 2/1/80 providing that "visitation between [the mother] and her son take place under the supervision of the agency for the foster mother."

agency. At a later date, the mother was abused by the adult male in that home and was forced to move out.

There is nothing in the record to support a conclusion that the mother refused to perform parental duties as contemplated by § 311(1) of the Adoption Act. Nor does the chancellor's opinion address itself to any facts which, in the opinion of the lower court, would support this result. A parent is required to exert herself to take and maintain a place of importance in the child's life. *In re Adoption of M.M.*, 492 Pa. 457, 424 A.2d 1280 (1981). But even where there has been *no* contact between parent and child for a period of more than six months—which is *not* the case here—a determination of failure to perform parental duties may not be found where the totality of circumstances does not warrant a termination of parental rights. *In re Adoption of J.A.B., id.,* 487 Pa. at 89–90, 408 A.2d at 1368. A finding of abandonment will not be predicated on parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may result only when a parent has failed to utilize all available resources to preserve the parental relationship. *In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977). A parent's performance of parental obligations must be measured in light of what would be expected of an individual in circumstances in which the parent under examination finds herself. *In re Adoption of B.D.S.,* 494 Pa. 169, 431 A.2d 203 (1981).

In view of the irreversible nature and serious emotional impact of the involuntary termination of parental rights, such action is not authorized unless a preponderance of the evidence clearly warrants it. *In re Adoption of Baby Girl Fleming,* 471 Pa. 73, 76, 369 A.2d 1200, 1202 (1977); *In re Adoption of McAhren,* 460 Pa. 63, 70, 331 A.2d 419, 422 (1975). In this case, the record establishes that the agency, CSEC, on frequent occasions, ignored the directions of the court to promote visitation and did not implement recommendations of the multidisciplinary team with which the agency disagreed. It sought and secured an order terminating visitation shortly after the chancellor had concluded,

following argument on exceptions to his decree, that the mother had not received a reasonable opportunity to visit her son. It withheld information regarding the infant's health and therapy program from the mother's counsel on the pretext that this was confidential information. It limited contacts between the mother and her child to periods of less than two hours and, with rare exceptions, these contacts occurred in the presence of an agency employee or the foster mother.

On the question of whether the record clearly warrants a finding under § 311(1) of the Adoption Act that appellant has refused and failed to perform her parental duties in excess of six months, I would hold that the evidence does not justify the termination of the mother's parental rights and hence would vacate the lower court decree.

## § 311(2)

Since the petition filed in this case proceeded on the separate grounds of §§ 311(1) and 311(2), the petitioner's burden can be met in showing by the *preponderance* of the evidence that either of the disjunctively listed elements of § 311 was satisfied. *In Interest of T.S.L.*, 487 Pa. 245, 248, 409 A.2d 332, 334 (1979); *see Matter of Adoption of David C.*, 479 Pa. 1, 7, 387 A.2d 804, 807 (1978). My review of the record leads me to conclude that it is equally inadequate to support termination under § 311(2).

The form petition filed by CSEC merely avers, in a conclusionary fashion by tracking the statute, that:

[T]he repeated and continued incapacity, neglect or refusal of the parent has caused the subject child to be without essential parental care, control or subsistence necessary for his/her [sic] physical or mental well-being and the conditions and causes of the incapacity, neglect or refusal cannot or will not be remedied by the parent.

This form language is repeated in the printed decree signed by the lower court in its order of October 6, 1980 and again in its opinion filed June 10, 1981. However, it is evident from reviewing the opinion of the lower court that the

decision to terminate the parental rights of the mother was based solely upon the lower court's conclusion that "the respondent does not have the capability and cannot acquire the capability to cope with and handle this particular child and, consequently, [the lower court] must reinstate its Decree of October 6, 1980." A fair reading of both the lower court's opinion and the record demonstrates that neither "neglect" nor "refusal" was an issue before the court, and that the termination decree depends upon the chancellor's inferences, deductions and conclusions concerning the mother's *incapacity*.

When proceeding under § 311(2), three things must be shown before a natural parent's rights in a child will be terminated on grounds of parental incapacity: (1) repeated and continued incapacity must be shown; (2) such incapacity must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the *causes* of the incapacity cannot or will not be remedied. *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975).

My reading of the record has not uncovered competent evidence to clearly establish *any* of the three elements which must be shown to exist. The lower court, in its opinion, finds that the mother "does not have the qualities necessary to parent this child. She has had ample time since 1978 to show whether she could improve herself sufficiently to handle this particular child."

However, the evidence presented by CSEC consisted primarily of accounts by the caseworker(s) and the foster mother regarding the interaction between the natural mother and her son. While much of the evidence reflects that the brief visitations often included anxiety and withdrawal by the son, there is absolutely no evidence which would tie together the behavior of the son as flowing directly from his mother's alleged incapacities. On the contrary, the only possible competent evidence on this point was presented by a pediatrician who was familiar with the child's medical history since the child was about six weeks of age. She testified

that the child had neurological disability, developmental delays and some physical problems. She indicated that the child had an unstable autonomic system reaction and had undergone some behavioral changes. The pediatrician pointed out that "certain children with the type or problem that [this child] has are not easily adaptable to changes in the environment, to changes in handling." She further noted that, not only in terms of previous visits with the mother *but also in terms of previous hospitalizations,* the child "separates very poorly from his foster mother and undergoes a great deal of problems."

In its short opinion justifying its decree, the lower court only referred to the pediatrician's opinion that the child should not be moved from his present home, a foster home, at the time of the hearing in June 1981 because of the problems which the child suffers. Surely, the need to maintain a temporary, stable foster home environment arising from the medical and neurological problems of the child, even if relevant, is not the kind of demanding evidence necessary to support a termination decree. *See Jones Appeal,* 449 Pa. 543, 547, 297 A.2d 117, 119 (1972).

CSEC seems to place great weight on the failure of the mother to comply with the counseling procedures recommended by the multi-disciplinary team. The mother resides in a rural area some twenty miles from the Counseling Center to which she was directed and some thirty miles from Erie where she was expected to attend parenting classes. She does not drive and did not have regular access to a car. There was no public transportation available. CSEC conceded that there was no homebound instruction available and that the agency provided no transportation in cases such as this. At the time of the final hearing, the mother testified that she was then enrolled in parenting classes which had given her a different outlook on matters and taught her something about herself. The mother's former counsel was permitted to testify, without contradiction in the record, that the mother was attending parenting classes at Family Counseling in Union City, that the Family Counseling coun-

selor had reported that progress was being made, that the mother was grasping the material and that the Family Counseling counselor felt that the mother was both sincerely interested in caring for her children and was strongly motivated. This is totally inconsistent with the lower court's conclusion that the mother could not acquire the capability to cope with and relate to this child.

Brief mention should be made regarding the relationship between the foster mother and the family here involved. The mother's former counsel testified that, on February 25, 1981, she had met with the protective service caseworker of CSEC and had been informed that the foster mother, who had had actual custody of the child involved in this case since the time he had been removed from his mother at four weeks of age, was in line for adoption of this child. This was not denied by the caseworker. When asked at the June 3, 1981 hearing whether she wanted to adopt the child, the foster mother testified that if the opportunity occurred, she would consider it. The mother's former counsel also testified, without contradiction by either the petitioner or the court, that the lower court had expressed its opinion, at the hearing on February 19, 1981, that if the foster mother was in line for adoption of the child, the child should be moved out of *that* foster home, preferably to a foster home closer to the mother's residence. This was not done.

Since the issue on this appeal is the capacity of the natural mother to relate effectively to her child, and since a substantial part of the testimony before the lower court involves both the testimony of the foster mother and the circumstances surrounding visitations occurring within the foster mother's home, it is difficult to avoid the troubling question of whether any fair test of the natural mother's capacity could take place in an environment where the setting is prepared and potentially controlled by a party possessing an abiding self-interest. Where, as here, the agency refused to implement a recommendation from a professional on its own multi-disciplinary team for a minimal one-week trial period so that the mother could attempt to re-establish a genuine

relationship with her son, and where the child involved has, without interruption, been living in the home of a foster parent who very well may have an intense, albeit well-meaning, desire to protect and continue that relationship by converting her status from foster mother to adoptive parent, this court should not be prepared to conclude that petitioner has satisfied its burden to secure termination of those sacred parental rights of the natural mother.

## Conclusion

Cases involving involuntary termination of parental rights can often be most difficult to decide. This is because, lurking in the background, is the desire to insure the best interests of the child or children involved. But that question cannot be reached unless, and until, a determination is properly- made that the elements found in § 311 of the Adoption Act have been satisfied through a preponderance of the competent evidence brought forth on the fitness of the parent under attack. *See In re Adoption of R. I.*, 468 Pa. 287 n.12, 361 A.2d 294 n.12 (1976), *appeal dismissed, U.S. cert. denied*, 429 U.S. 1032, 97 S.Ct. 722, 50 L.Ed.2d 743 (1977).

On this record, I have no difficulty in concluding that CSEC has fallen far short of meeting its burden. When a child has been placed in foster care, a parent has an affirmative duty to work towards the return of the child. *See In re Burns, supra.* However, even when there has been a long separation occasioned by parental neglect or incapacity, termination of parental rights will not be ordered if there is a reasonable possibility that the causes and conditions which have led to the separation can be remedied and the family restored. *In re William L., id.*, 476 Pa. at 333–34, 383 A.2d at 1233.

In all, this is not a case where the parent abandoned or utterly failed to satisfy her parental obligations. Her child was taken from her one month after birth for failure to thrive and yet has been withheld from appellant's care throughout the proceedings despite the child's improvement. The mother has taken advantage of those court-ordered

visitation privileges which have been extended. At no point has she failed to visit her child for any extended period of time, with the exception of those times when visitation was refused.

The cause which led to the separation between mother and child in this case was the child's failure to thrive when barely an infant. While it appears clear from the record that the child has multiple physical or neurological problems, the record is devoid of any competent evidence of any attempt on the part of the petitioner to review these problems with the mother and seek to fashion a plan by which she might begin to cope with these unique aspects of her son's development. Given the irreversible nature of involuntary termination, I am not prepared to conclude that the conditions existing at the time of this child's birth which may have led to his separation from his mother cannot be remedied.

The trial court's conclusion that the involuntary termination of this mother's parental rights was justified under either § 311(1) or § 311(2) of the Adoption Act cannot stand. I do not feel the demanding standard of evidence required to support termination has been met.

I therefore would vacate the decree and remand this matter for further proceedings consistent with this opinion.