452 A.2d 1021

**In the Matter of M.L.W., a minor.**

**Appeal of B.W.**

Superior Court of Pennsylvania.

Submitted April 13, 1982.

Filed Oct. 8, 1982.

Reargument Denied Dec. 17, 1982.

30

Stephen E. Hall, Meadville, for appellant.

John Fuller, Meadville, for appellee.

Before HESTER, JOHNSON and POPOVICH, JJ.

JOHNSON, Judge:

This is an appeal from the final Order dated December 24, 1980, terminating Appellant's parental rights to her child M.L.W. We reverse.

The record indicates that the child was born on April 9, 1974 to Appellant, age twenty, who was then residing with foster parents. The child's father is the son of Appellant's foster parents. Appellant and the child's father never married. Sometime prior to November of 1978, Appellant and the child moved out of the foster home and into the home of Appellant's father in Crawford County.

In November of 1978, Appellant and her father sought out the assistance of the Meadville Mental Health Center concerning their inability to control the child. The staff psychologist testified that, after observing the child, he found him to be manipulative. The child was observed as having a speech impediment and his appearance was "... a little dirty, clothing wasn't the best." Four sessions of parental counseling and play therapy were scheduled from November of 1978 through January of 1979, after the initial visit.

On January 25, 1979 Appellant and her father contacted Child Welfare Services of Crawford County (CWS) concerning their continued problems with the child, i.e., temper tantrums, running away, refusal to follow routines, and threatening Appellant and her father with knives. The testimony is disputed as to whether Appellant inquired into the possibility of the child's placement in foster care at this meeting. Thereafter, on February 6, 1979, CWS took temporary emergency custody of the child following allegations that the child, at age four, had been abused and sexually molested. The child was found to have pinworms, pneumonia and a speech impediment. Prior to a dependency hearing, Appellant appeared before the court with counsel and consented to the temporary voluntary placement of the child in a foster home. Subsequently, the allegations of abuse were determined to be unfounded by CWS. Appellant then voluntarily admitted herself to the Mental Health Center in Meadville for one week, after becoming hysterical upon turning the child over to CWS. Between February and May of 1979, Appellant visited her son approximately once a week.

Appellant was administered I.Q. and psychological tests in May of 1979. She was determined to have an I.Q. of 65, which is in the range of mental retardation, and achievement at the third grade level. Appellant testified that prior to the administration of the tests, she discovered that her sister had taken an overdose of drugs, that she was distracted and she informed the psychologist administering the tests of this. The psychologist testified that he did recall Appellant informing him of her sister and she did not appear upset, in any event.

The child was psychologically tested in January and May of 1979 and found to have an I.Q. of 70 and 79, respectively. The child's speech problem was improved in February, as noted by the psychologist, as was his general physical appearance.

A petition for involuntary termination of parental rights of both parents was filed by CWS on August 8, 1979. The grounds for Appellant's termination were based on 1 P.S. § 311(2) which states:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

At the hearing on September 7, 1979, both the caseworker for CWS and the psychologist testified that it was their opinion that Appellant's rights should be terminated on the basis that she was unable to care for the child and will not be able to do so in the future.

The lower court terminated Appellant's parental rights and the rights of the natural father, and after the dismissal of exceptions filed by Appellant, entered a final order terminating Appellant's parental rights. The lower court based its decision on the fact that Appellant was retarded and, according to the psychologist, improved her parenting skills only marginally during the counseling sessions. His opinion, as well as that of the CWS caseworker, was to terminate

Appellant's rights, as she was incapable of providing essential parental care for the child at that time or at any time in the future.

Appellant alleges that the lower court did not have sufficient compelling evidence to support its conclusion that she lacks the capacity to provide essential care and subsistence to the child and that such incapacity is irremediable. We agree.

■ Our scope of review is limited to a determination of whether the court's decree terminating parental rights is supported by competent evidence. *In re Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981); *In Re D.K.W.*, 490 Pa. 134, 415 A.2d 69 (1980). However, the lower court's inferences, deductions and conclusions are subject to review. *In re Adoption of J.A.B.*, 487 Pa. 79, 408 A.2d 1363 (1979). Concerning the standard of proof, we are mindful of the recent U.S. Supreme Court opinion in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) holding that termination of parental rights requires, at a minimum, clear and convincing evidence. However, because of our determination in the instant case, we need not discuss the applicability of the holding in *Santosky* at this time.[1]

■ Because of the importance placed on the family, the Commonwealth may disrupt the parent-child relationship only upon a clear showing of necessity; moreover, even if removal is necessary to protect the child, every effort should be made to reunite the family. *In re Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976), *appeal dismissed, U.S. cert. denied*, 429 U.S. 1032, 97 S.Ct. 722, 50 L.Ed.2d 743 (1977). All circumstances must be considered when analyzing a parent's performance of parental obligations in a proceeding for termination of parental rights; the parent's performance must be measured in light of what would be expected of an

1. Prior to the decision in *Santosky*, the standard of proof in involuntary termination cases in Pennsylvania was preponderance of the evidence. *See e.g., In re Adoption of M.M.*, 492 Pa. 457, 424 A.2d 1280 (1981); *In the Interest of T.S.L.*, 487 Pa. 245, 409 A.2d 332 (1979).

individual in circumstances which the parent under examination finds herself. *In re Adoption of B.D.S., supra.*

■ It is clear that termination of parental rights cannot be justified merely by demonstrating that the home is "submarginal" and likely to result in "cultural deprivation". *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978), *U.S. cert. denied, sub nom. Lehman v. Lycoming County Children's Services, et al.,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).

Three things must be proved before a natural parent's rights in a child will be terminated under section 311(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975).

■ The record indicates that Appellant voluntarily solicited the aid of the Mental Health Center and CWS to assist her in gaining the necessary parenting skills. Only four parental counseling sessions were scheduled in addition to the initial interview with the psychologist. Upon gaining custody of the child, nothing was recommended for Appellant's rehabilitation by CWS. She was merely tested, as was the child, for information concerning levels of intelligence and achievement. This is clearly insufficient.

When termination is sought on the basis of parental conduct causing the child to be without essential parental care, the requirement that the conduct be shown to be irremediable could be met rarely, if ever, absent evidence that the deficiencies in parental conduct had been identified, and the parent was nonetheless unwilling or unable to modify the conduct to remedy the situation.

*In re William L., id.,* 477 Pa. at 332 n. 5, 383 A.2d at 1232 n. 5.

A mere two months of counseling where *some,* albeit *marginal,* improvement of Appellant's parenting skills were

noted and the administering of psychological tests does not represent sufficient evidence in the instant case that Appellant is incapable of performing her parental duties, nor that the lack of capacity is irremediable. This is particularly true in the instant case where the Appellant urges that her recent discovery of her sister's drug overdose prevented her from performing at her best on the only battery of tests administered to her in May 1979.

Furthermore, the lower court appears to have relied heavily on the I.Q. score of Appellant. As stated in *In re William L., id.,* 477 Pa. at 351–52 n. 26, 383 A.2d 1243 n. 26;

> In reviewing whether the evidence supports the orphans' court's decree, we have placed only limited reliance on appellant's IQ score. Experts generally agree that socially and culturally disadvantaged people tend to score lower on standardized intelligence tests, which suggests that cultural bias may affect the result. See Galliher, Termination of the Parent-Child Relationship: Should Parental I.Q. be an Important Factor?, Law and the Social Order 855, 865–66 (1973). Moreover, "No Study has ever documented the premise that unintelligent parents are unable to give love and affection." Id. at 871. Consequently, we consider appellant's test score only as a factor among many relevant to her incapacity to meet the essential needs of her children.

The lower court had little, if any, other factors to rely on, other than Appellant's I.Q. score. The record indicates that the child's behavioral problems relating to obedience may have been caused by the foster parents with whom Appellant resided until the fall of 1978. The undisputed testimony of Appellant was that the foster parents encouraged the child to obey them only and to ignore the wishes of Appellant. Also, the opinion of the CWS caseworker is of limited value because of its reliance on the limited contact between the caseworker and Appellant and her child, as well as its reliance on the child's behavioral and speech improvement in the foster home. The caseworker testified that she never observed any behavioral problem in the child. Again, this is

clearly insufficient proof of Appellant's lack of capacity now and in the future. Also, the psychologist's opinion appears to be based on the best interests of the child and his improvement in foster care, rather than the abilities of Appellant. *See In re Adoption of R.I., supra.*

The record clearly indicates Appellant's love for the child and her desire to attempt to improve her parenting skills. The record does not indicate repeated and continued incapacity of Appellant that cannot or will not be remedied. We cannot and will not condone the permanent removal of a child from a parent under these circumstances. A parent must be able to seek the assistance of a Child Welfare Service with the expectation that the agency will exert its best efforts in working with the parent and the child to improve the parent's skills and understanding. The premature filing of termination petitions by an agency thwarts the trust necessary for the advancement of the purposes of this relationship between agency and parent.

The order dated December 24, 1980 is reversed.

HESTER, J., files a dissenting statement.

HESTER, Judge, dissenting:

The majority would leave an eight-year old boy, suffering from a serious speech disability, in the care and custody of his mother, a 27-year old mentally retarded woman with an I.Q. of 65 and a third-grade level of achievement. The record indicates that the parenting deficiencies of the mother are incorrectible due to her severe mental retardation. As stated in the official comment to the Adoption Act of 1970; section 311(2) "centers judicial inquiry upon the welfare of the child rather than the fault of the parent." It is obvious that this child's essential needs have not been met.

I would, therefore, affirm on the well-reasoned opinion of Judge Walker, of the court below.