**In re A.G.A.W.**

266

C.P. of Lehigh County, no. A2010-0027.

*Lisa Bartera,* for Children and Youth Services..

*Shannon Tiergallini Smith,* for father.

*William E. Doyle,* for mother.

FORD, *J.,* February 28, 2011—On February 26, 2010, the Lehigh County Office of Children and Youth Services (OCYS) filed a petition for involuntary termination of the parental rights of M.S. to her biological child, A.G.A.W.. On the same date, OCYS filed a petition for involuntary termination of the parental rights of A.W., the biological father of A.G.A.W. In the petitions, OCYS alleged various acts and omissions by the parents that constitute grounds for involuntary termination of parental rights under 23

Pa.C.S. § 2511(a)(1) and § 2511(a)(2). OCYS also made allegations in the petition under 23 Pa.C.S. § 2511(b) that the termination of the biological parents' rights would serve A.G.A.W.'s best interests.

The court conducted hearings on these petitions on September 2, September 3, and November 12, 2010. The parents were represented by counsel at the hearings. The parents participated in the hearings and testified. All counsel submitted written closing arguments following the hearings.

After consideration of the evidence and the applicable law, I conclude that the grounds for involuntary termination of parental rights of M.S. and A.W. have been established by clear and convincing evidence. Further, the evidence demonstrates that termination of the parental rights of the biological parents would best serve the needs and welfare of the minor child, A.G.A.W..

In this opinion, I explain the reasons for these conclusions. I begin by explaining what happened in this case.

## FINDINGS OF FACT

1. A.G.A.W. is the subject of these proceedings. A.G.A.W. is four years old. He was born on June 27, 2006.

2. A.G.A.W.'s biological mother is M.S.. M.S. was 28 years old when she testified in these proceedings on November 12, 2010. M.S. has an eleventh grade education. M.S. gave birth to A.G.A.W. while serving imprisonment in the Lehigh County Prison on a parole violation.

3. Before A.G.A.W.'s birth, A.W., the biological father, lost his home "because the bank sold the house that

[he] was living in, and [he] had to move." A.W. moved in with a friend. Then OCYS secured a place for him at the Sixth Street Shelter. A.W. brought A.G.A.W. from the hospital after he was born to the Sixth Street Shelter to live with him. They stayed there from June of 2006 until October 16, 2006, when A.W. moved with A.G.A.W. to 840 Kieffer Street, Fountain Hill, Lehigh County. A.W. lived in Fountain Hill with A.G.A.W., an 18-year-old daughter and another daughter who was younger.

4. M.S. joined A.W. and A.G.A.W. at the Kieffer Street home in September of 2007. M.S. was on parole at that point and was attending out-patient drug and alcohol treatment. After completion of the treatment in November of 2007, she relapsed into drug use. These were the only two months in A.G.A.W.'s life when M.S. provided care for him during which she was not using illegal drugs.

5. On December 17, 2007, A.W. and M.S. had a loud argument at their Fountain Hill home. A.W. then struck M.S. on the side of her head with a sharp metal object that resembled a pick while M.S. was holding 17-month-old A.G.A.W. M.S. was admitted to Hahnemann Hospital in Philadelphia to repair damage to her eye caused by the attack. A.W. was charged with offenses related to the attack and was committed to the Lehigh County Prison on December 18, 2007. December 17, 2007, was the last date on which A.W. provided care for A.G.A.W. The charges filed against A.W. included aggravated assault for what he did to M.S. and endangering the welfare of A.G.A.W. because he was lying on M.S.'s chest at the time of the attack. Based on this incident, A.W. was also charged with having violated an earlier probation. After an investigation, OCYS did its report assigning A.W. an "indicated" status as perpetrator of abuse because he created an imminent risk of serious physical injury to A.G.A.W.

6. When A.W. was taken to prison for assaulting M.S., M.S. also was not available to care for A.G.A.W. She was being treated for the injury to her eye and she was actively using drugs. As a result, this court entered an emergency order addressing custody (Lehigh County case number 1157-J of 2007). M.S. assisted in placing A.G.A.W. with Amy Gross. After some time, Ms. Gross tried to place A.G.A.W. with Wendy Honzo-Vassa because Ms. Gross was being evicted from her home. When M.S. told OCYS that she did not know Ms. Honzo-Vassa, this resulted in an order dated May 14, 2008, placing A.G.A.W. in foster care. Both M.S. and A.W. were incarcerated at the time of this order.

7. After A.G.A.W.'s placement with Ms. Gross starting in December of 2007, A.G.A.W. has remained in the custody of OCYS from May, 2008, through the hearings in the present proceedings. Thus, A.G.A.W. has not lived with either biological parent for more than 36 months of his young life. Abbade was declared dependent (Lehigh County case number 1157J-2007) on June 2, 2008, and committed to the care of OCYS. There were emergency orders entered before this date.

8. M.S. was last released from prison on May 4, 2010. She went from the prison to a 28-day drug rehabilitation program in Altoona, Pennsylvania. She successfully completed that program and settled in her present two bedroom apartment at 230 East Church Street, Slatington, Lehigh County, where she still lives. Since her release from prison in May, M.S. continues on parole under the supervision of the Lehigh County Probation Department.

9. M.S. is part of a group that provides her support in a number of ways. David Arispe is part of that group. He has given M.S. part-time employment in his landscaping and

painting business. The members of the group also assist M.S. in getting her to various appointments because M.S. does not drive. The group provides her with emotional support and assists her in maintaining sobriety.

10. M.S. has been addicted to crack cocaine since the age of 19. However, she has not used illegal drugs since the start of her last incarceration in late summer or early fall of 2009 (presumably) until her release from a rehabilitation program in May, 2010. She has not used illegal drugs from completion of that program through the last hearing on November 12, 2010.

11. What follows is M.S.'s significant criminal record:

A.  In Lehigh County case number___, M.S. pled guilty to facilitating escape, a felony, 18 Pa.C.S. § 5121(b) on May 25, 2004. She was sentenced to imprisonment for a period of not less than 6 months to not more than 12 months. She was paroled on August 11, 2005. She violated her parole on June 12, 2006 and was remanded to prison to serve the balance of her sentence.

B.  In Lehigh County case number___, M.S. pled guilty to prostitution, a misdemeanor, 18 Pa.C.S. § 5902. On May 25, 2004, she was sentenced to imprisonment of not less than three months to not more than 12 months. That sentence was ordered to be run concurrently with the sentence in case number.

C.  In Lehigh County case number___, M.S. pled guilty to another prostitution offense, 18 Pa.C.S. §5902, a misdemeanor. On December 23, 2005, she was sentenced to Lehigh County Prison for a period of not less than 52 days to not more than 23 months. She was granted immediate parole. On July 17, 2006,

defendant's parole was revoked and she was remanded to prison to serve the balance of her sentence. On August 16, 2006, she was granted another parole. Then, on November 13, 2006, she was found to have violated this second parole. She was remanded to the prison to serve the balance of the sentence. The sentencing judge gave her another parole on September 6, 2007. Her parole was revoked on July 7, 2008. She was again remanded to the prison to serve the balance of her sentence. The sentencing judge included in the order remanding her to the prison that she shall not be granted a re-parole.

D.  In Lehigh County case number___, M.S. entered a guilty plea on May 22, 2008, to false identification to law enforcement authorities, 18 Pa.C.S. § 4914(a), and to simple assault, 18 Pa.C.S. §2701(a)(1), both misdemeanors. On the same date, M.S. was sentenced to a term of imprisonment for one year but she was granted immediate parole. On February 18, 2009, M.S. was found to have violated her parole. She was remanded to the prison to serve the balance of her sentence. She was paroled on June 4, 2009. The court again found her in violation of that parole and remanded her to the prison to serve the balance of the sentence on September 9, 2009.

E.  In Lehigh County case number___, M.S. entered a guilty plea to possession of drug paraphernalia, 35 P.S. § 780-113(a)(32). She was sentenced to probation on the same day as her guilty plea. On September 9, 2009, M.S. was found in violation of her probation and was sentenced to imprisonment of not less than three months to not more than 12 months.

F.  In Lehigh County case number___, M.S. entered a guilty plea to false identification to law enforcement

authorities, 18 Pa.C.S. § 4914(a). On the same date that M.S. entered the guilty plea, she received a prison sentence for the period of time that she had served to that date.

12. As to her present parole, M.S. has had some difficulties in complying with requirements; however, they are related to her inability to obtain transportation to places required by her parole officer.

13. M.S. is presently pregnant with twins. She conceived them during the summer of 2010.

14. At the time of A.W.'s testimony at the hearing on November 12, 2010, he was 56 years old. He has an eleventh grade education. Including A.G.A.W., A.W. has 11 children, two of whom are minors.

15. In Lehigh County case number___, A.W. was convicted of false reports to law enforcement authorities (falsely incriminating another), 18 Pa.C.S. § 4906(a), on September 11, 2007. The magistrate district judge sentenced the defendant to five days in prison followed by 12 months of probation. On October 15, 2008, A.W. was found to have violated his supervision. He was remanded to the Lehigh County Prison, but he was granted immediate parole to his state sentence identified in the following finding of fact.

16. In Lehigh County case number___, A.W. entered a guilty plea to aggravated assault, a felony, 18 Pa.C.S. § 2702(a)(4), on August 26, 2008. On the same date, he entered a guilty plea to endangering welfare of children, a misdemeanor, 18 Pa.C.S. § 4304(a)(1). On September 30, 2008, the defendant received a state confinement sentence of not less than two years to not more than 10 years for the aggravated assault and a concurrent confinement sentence

of not less than one year to not more than three years for the endangering charge. An appeal to the Superior Court was later quashed. Defendant's petitions under Pennsylvania's Post-Conviction Relief Act were dismissed because the defendant failed to appear for hearing on the petitions. (He was on parole at the time.)

17. The aggravated assault and endangering convictions stemmed from A.W.'s attack on M.S. while M.S. was holding A.G.A.W. A.W. remained incarcerated on these offenses from his arrest in December, 2007, until he was paroled to Adapt Halfway House on South Fourth Street in Allentown. When he was released from Adapt, he went to an apartment at 2427 South Fourth Street, Allentown. He lived there with Tyler Roman. After living in that apartment for approximately one month, the defendant secured his own apartment at 230 Church Street, Slatington, Lehigh County. While defendant was serving his parole, he also secured employment through David Arispe who was good to M.S. and A.W.

18. In August, 2010, A.W. was confined for violating his state parole by having unauthorized contact with M.S., the victim of the aggravated assault. A.W. was sent to Mahanoy State Correctional Institution. He remained there for several months until he was sent to the Coleman Center in Philadelphia where he was a confined resident. A.W. was still confined at Coleman Center at the time of the November 12, 2010, hearing.

19. As part of the OCYS plan for A.W. to reunite with A.G.A.W. in A.G.A.W.'s dependency case, A.W. was required to undergo a violent offender evaluation and to complete any recommended violent offender treatment. Further, the court, in sentencing A.W. on the aggravated assault and endangerment charges, required that he undergo

the evaluation and therapy recommended by his parole officer. The parole office required the same evaluation and treatment as OCYS.

20. When A.W. was in prison, he completed programs such as violence prevention, money smart, parenting, and victims' awareness. When A.W. underwent a violence assessment evaluation by Doris Stabp, a licensed social worker who has worked evaluating and treating offenders, A.W. claimed his innocence of the aggravated assault and endangering charges even though he had previously pled guilty to those offenses. While Ms. Stabp completed her evaluation of A.W., she discontinued treatment with him shortly after it began. Among the reasons for discontinuing the treatment was that A.W. was not forthcoming about the offenses that he committed against M.S. and A.G.A.W. A.W. has not adequately addressed through therapy his issues with violence. The prison programs were not deep-rooted therapy to address his issues. Violence prevention therapy was not possible with A.W. while he denied committing the violent offenses that he had previously admitted.

21. At various times since A.G.A.W. has come into the care of OCYS, both M.S. and A.W., separately, have had supervised visits with him, one or two hours per visit, one or two times per week. After obvious discomfort by A.G.A.W. with M.S. in initial visits, A.G.A.W. has warmed up to M.S. and the majority of the visits have gone well. With only minor problems, A.W.'s visits with A.G.A.W. have proceeded smoothly with A.G.A.W.'s enjoying them and feeling at ease with A.W. There have been interruptions in the visiting routine for both biological parents because of OCYS caseloads, M.S.'s frequent changes among prison, rehab, and private residence, and A.W.'s transfers within the prison system and his parole violation.

22. There was a special condition entered by the sentencing judge on November 30, 2008, and later the parole officer, directing A.W. to have no contact, direct or indirect, with M.S. and A.G.A.W. because they were the victims of his crimes. In addition to A.W.'s violating this condition by meeting M.S. at the mall, he also had sex with her during his parole supervision which may have led to M.S.'s pregnancy with the twins. A.W. insisted in his testimony that he is the father of the twins. M.S. testified that it is possible that A.W. is the father.

23. M.S. was aware that defendant was prohibited by court order and by the parole officer from having contact with her. Despite that, she had the meeting with him at the mall and had sexual intercourse with him.

24. A.W. attempted to mislead the court in the present proceedings by trying to have the court believe that the only unauthorized contact that he had with M.S. was a meeting at a mall for which his parole was violated. He argued, unconvincingly, that even this contact was not unauthorized because it came from conflicting instructions from the juvenile court master and the parole officer.

25. Mother completed a rehab at Duncanville and has been at Step-by-Step for the month and one half before the November 12 hearing. Step-by-Step is a dual diagnosis program which treats addiction and mental illness.

26. In addition to knowingly assisting A.W. in violating his parole by having contact with him at a mall and by having sex with him, M.S. was asked questions at the November 12 hearing that gave her the opportunity to clear up the misconception that A.W. created that his only contact with M.S. while he was on parole was at the mall. She did not explain that she also had sex with him in violation of his sentencing order and his parole. Later

in the hearing it became clear that A.W. and M.S. were having sex during A.W.'s parole.

27. A.G.A.W. has been in seven different placements since he was placed in the custody of OCYS. A.G.A.W. has been in foster care for 29 months and before that he was voluntarily placed with Ms. Gross for several months. A.G.A.W. has not lived with either biological parent for more than half of his life. He is happy, comfortable, and safe in his present home.

## DISCUSSION AND CONCLUSIONS OF LAW

There are two distinct aspects to a termination of parental rights proceeding. First, the grounds for the involuntary termination of parental rights must be established by clear and convincing evidence. *In re Adoption of C.L.G.,* 956 A.2d 999, 1004 (Pa.Super. 2008). If the grounds for termination are established, the court must determine whether termination would serve the needs and welfare of the minor. *Id.*

In each petition filed by OCYS against M.S. and A.W., OCYS has alleged grounds for involuntary termination of their parental rights under 23 Pa.C.S. § 2511(a)(1) and (2).

That statute reads:

Grounds for involuntary termination

(a) General rule. - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of

relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. 23 Pa.C.S. §2511(a)(1) and (2).

Pertinent to the ground for involuntary termination alleged by OCYS under 23 Pa.C.S. §2511(a)(1) is the following provision: "With respect to any petition filed pursuant to subsection (a)(1)..., the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Pennsylvania's appellate courts have often commented on parents' crucial role in the lives of their children. "[W]hile parents have broad discretionary authority over their children's lives, they also have serious concomitant responsibilities which the Commonwealth has a right and duty to enforce." *In re J.W.*, 578 A.2d 952, 958 (Pa. Super. 1990). The language of 23 Pa.C.S. § 2511(a)(2) "denotes certain irreducible minimum requirements to which all children are entitled from their parents, including adequate housing, clothing, food, love, and supervision." *In re J.W.*, 578 A.2d at 958. The performance of parental duties is an affirmative obligation. It requires constant demonstrations of "parental love, protection, and concern.... [A] parent must exert himself to take and maintain a place of importance in the children's life." *In re Adoption of M.J.H.*, 501 A.2d 648, 652 (Pa. Super. 1985) (citations omitted).

In considering the totality of the circumstances presented

through the evidence in this case, *In re E.S.M.,* 622 A.2d 388, 392 (Pa. Super. 1993), the evidence demonstrates that M.S. has refused or failed to perform parental duties as to A.G.A.W. for a period in excess of six months immediately preceding the filing of that petition (the petition filed on February 26, 2010) so the ground under 23 Pa.C.S. § 2511(a)(1) has been established as to M.S.

She gave birth to A.G.A.W. while she was a prisoner. From that point until the filing of the present petition, she was living under one of two circumstances. First, she was a prisoner due to her criminal conduct or parole violations or, second, except for two months, she was on parole actively using illegal drugs to feed her addiction. She did not comply with significant and reasonable directives from OCYS for the return of her child from foster care. Thus, she has refused or failed to perform her parental duties for more than six months preceding the petition.

From A.G.A.W.'s birth through the summer of 2010, M.S. has refused to provide A.G.A.W. with essential parental "care, control, and subsistence" necessary for his "physical and mental well-being." This has occurred from the combination of drug usage, imprisonment and connivance with A.W. As to A.W., she spent intimate time with him, the man who has not addressed through therapy his abuse of her and his endangerment of their child. She spent this time with him in violation of court directives. She did these things knowing they would jeopardize A.G.A.W.'s return to her. Thus, the refusal will not be altered by M.S. The second ground, 23 Pa.C.S. § 2511(a)(2), for termination of her parental rights has been established.

OCYS has proven the grounds for termination of A.W.'s parental rights under 23 Pa.C.S. §2511(a)(1). Except for

A.W.'s caring for A.G.A.W. for the first 18 months of his life and the supervised visits arranged since A.W.'s confinement beginning in December of 2007, A.W. has been absent from A.G.A.W.'s life. This is because of his criminal conduct, namely, the aggravated assault upon M.S. and the endangering of A.G.A.W. which led to pretrial incarceration, a state confinement sentence, and then further confinement after a violation of parole.

As to the second basis for termination, the appellate courts have held that parental incapacity under §2511(a)(2) cannot be based solely on incarceration. See *In re Jones*, 449 Pa. 543, 297 A.2d 117 (1972); and *Bartasavich v. Mitchell*, 270, 471 A.2d 833 (Pa. Super. 1984). A.W.'s unavailability for A.G.A.W. due to confinement is a significant factor in this case but it does not stand alone. There are other significant factors.

At the time that A.W. entered the guilty pleas to aggravated assault and endangering the welfare of a child, A.W. admitted under oath that he assaulted M.S. and endangered A.G.A.W. by the use of the pick-like device. (See Lehigh County criminal case number, N.T., 8/26/08, p.25.) A.W. is bound by these admissions that he made under oath at the time of his guilty plea. See *Commonwealth v. Muhammad*, 794 A.2d 378,384 (Pa.Super. 2002); and *Commonwealth v. Barnes*, 687 A.2d 1163, 1167 (Pa. Super. 1996). At his sentencing hearing on September 30, 2008, A.W., again under oath, gave a different version of what happened to M.S. On this occasion, about a month after admitting the assault on M.S., he stated:

> In between this time we (A.W. and M.S.) were going to the store one night to get cigarettes when all this took place. A car pulled up. Two Spanish guys got out. They called her (M.S.) by her name.

I knew what it was already because it happened again in the past. She (M.S.) stole some drugs from them and they wanted their drugs. And one thing led to another and that's how she got hurt and hit. (Lehigh County criminal case number___, N.T., 9/30/08, pp. 14-15.)

The entire docket in this criminal case was received into evidence as Exhibit P-3 at the September 2, 2010, hearing. The notes of testimony from the guilty plea and sentencing hearings are referenced in the docket and the notes of testimony are part of the record in that case.

The use of a device by A.W. on M.S. with the child close by demonstrates deep-seated issues with A.W. that must be identified and then treated before he can be an appropriate care giver for a child. It does not take a social science expert to lead me, as fact-finder, to this conclusion. This conclusion was made by the sentencing judge when he directed, as part of the sentence, that A.W. undergo "anger management evaluation, counseling, treatment, and therapy, including in-patient and out-patient treatment, as recommended by the parole agent." (Case number___, N.T., 9/30/08, pp. 19-20.) However, A.W. has made routing out his issues an impossibility. He has done this by denying his own responsibility for the assault and then shifting it to others after first admitting his offenses. He began the disingenuous denial process with his statement at the sentencing hearing. He continued the denials with Ms. Doris Stabf, the licensed social worker, who was attempting to do the evaluation and treatment. There is not an inkling in this record that A.W. has in the recent past or will in the future acknowledge his felonious criminal conduct. By his unwillingness to be straightforward and to work to address his issues, there will always be a concern about care-giving by him and violent propensities toward

women in his life and toward A.G.A.W.

OCYS, through Ms. Stabf, tried to present to the court Ms. Stabf's opinion that A.W. is at high risk to engage in assaultive conduct like that committed against M.S. The court rejects her opinion on that topic because of the factors that she used to reach that conclusion. These included allegations that A.W. sexually assaulted a minor step-daughter over a considerable period of time. That allegedly occurred in 1991 and early 1992. OCYS conducted an investigation which resulted in an "indicated" status naming A.W. as the perpetrator of the sexual abuse. There is no evidence that this ever led to an adjudication or criminal conviction. There were other factors mentioned by Ms. Stabf that the court rejects as bases for the conclusion that she reached. On the other hand, the testimony of Ms. Stabf was revealing in demonstrating A.W. refusal to acknowledge and confront his violence issues.

The court can place no faith in the promises of prospective good parenting by him. He is an incredible witness. As stated, he first admitted under oath in his criminal case that he assaulted M.S.. He then denied the assault a month later. A.W. was placed under oath at both of those hearings. Moreover, after trying to create the impression that he, himself, was victimized by conflicting court directives which resulted in his meeting M.S. at a mall, he was caught in lies at the November 12 hearing after which he admitted that he had sex with M.S. when he was not even allowed near her.

Because the statutory requirements for an involuntary termination have been proven as to both parents, I now examine whether termination would best serve the needs and welfare of A.G.A.W. as required by 23 Pa.C.S. § 2511(b).

In examining the needs and welfare of A.G.A.W., I have considered the physical, but I also took into account intangible factors such as love, comfort, security, and closeness. *In re Adoption of B.J.R.*, 579 A.2d 906, 914 (Pa. Super. 1990). I considered the nature of any parental bonds that have developed. I considered whether terminating parental rights would destroy something in existence between A.G.A.W. and his biological parents that is necessary and beneficial for A.G.A.W. *In re Matstock*, 611 A.2d 737, 747 (Pa. Super. 1992). A realistic determination is needed because "the state should not 'seek to preserve in law a relationship which no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care of the impersonal care of institutions.'" *In re Adoption of B.J.R.*, 579 A.2d at 915 (citations omitted).

In the hearings, M.S. has focused on events since May of 2010. After completing the rehab program that May, M.S. has generally complied with her parole conditions. While she missed mandated drug treatment meetings and some sessions with her parole officer, the parole officer attributed all of those to M.S.'s transportation difficulties. M.S. kept in contact by telephone with the appropriate person every time she missed an appointment. There is no evidence that M.S. has used drugs since she was last incarcerated. Despite initial aloofness by A.G.A.W., M.S.'s visits with him have gone well. A.G.A.W. has gradually warmed to M.S. to the point where the visits are enjoyable for both. I have considered these positive circumstances but they do not alter the fact that the grounds for termination have been proven, particularly that M.S. refuses to do what is necessary to be a responsible parent available to A.G.A.W. While she was supposedly changing her ways, she was undermining A.W.'s sentencing orders and the efforts of the parole officer and OCYS by her unauthorized contact

with A.W.

A.W. has exercised all visitation given to him (and he has sought more) during his imprisonment and A.G.A.W.'s dependency. He also appears to have been a capable and active parent during A.G.A.W.'s first 18 months. However, he has stubbornly refused to address his domestic violence issues. He has been deceptive with the court, his parole agent and OCYS about his contacts with M.S. He has been caught in that deception.

Any bonding that M.S. and A.W. have done with A.G.A.W. has been superficial. It is based on deception. It has not been beneficial to the child.

Under the uncontroverted testimony in this case from the CASA, Ms. Christina Breitfeller-Hill, A.G.A.W. is very happy, safe, and comfortable with his present foster family where he has lived since April 22, 2010. A.G.A.W. is doing well in the foster home. For all of these reasons, the grounds for termination have been proven by clear and convincing evidence as to both biological parents. It is in A.G.A.W.'s best interests that the parental rights of M.S. and A.W. be terminated.